**Michael Fuller, OSB No. 09357**
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
michael@underdoglawyer.com
Phone 503-222-2000

Of Attorneys for Plaintiff


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| **AMIT FATNANI** individually, and on behalf of all others similarly situated | Case No. 3:23-cv-00712 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff | |
| | Violations of Oregon Securities Law |
| vs | |
| **JPMORGAN CHASE & CO., EVOLVE BANK AND TRUST, INTERTRUST GROUP BV, PNC FINANCIAL SERVICES GROUP, INC., KEYCORP,** and **COLUMBIA BANKING SYSTEM, INC. AS SUCCESSOR TO UMPQUA HOLDINGS CORPORATION** | Demand for Jury Trial |
| Defendants | |

**CLASS ACTION COMPLAINT** – Page 1 of 54

## CLASS ACTION COMPLAINT

1. A bank should always be careful when providing financial services to an account holder, especially when certain "red flags" are present.

2. If a bank is not careful, the bank may be liable for losses if its financial services are used in furtherance of illegal actions like the unregistered sale of securities or the operation of a Ponzi Scheme.

3. Under Oregon law, a bank is liable if it participates in, or provides material aid to, these types of illegal activities.

4. Last year, a Portland man named Sam Ikkurty and his business partner were charged by the federal government with organizing a $44 million Ponzi Scheme that defrauded at least $18 million from 170 individuals through the unlawful sales of securities.

5. Plaintiff Amit Fatnani, an individual who lost $350,000, now files this class action to hold six separate banks and financial companies accountable for their roles in the Ponzi Scheme. At trial, Mr. Fatnani will present evidence that each of the six defendants in this case either participated in, or provided material aid to, the Ponzi Scheme organizers. The evidence will show that the Ponzi Scheme would not have been possible without the active participation of the six defendants in this case, each of whom are liable under Oregon law for their roles in the unlawful sales of securities.

## INTRODUCTION

**6.** Amit Fatnani ("Amit" or "Plaintiff"), an individual whose post office address is 23 Homestead St., San Francisco, CA 94114, files this action against Defendants Evolve Bank and Trust ("Evolve"), a financial services company whose principal place of business is 6070 Poplar Avenue, Suite 200, Memphis, TN 38119; InterTrust Group BV, dba InterTrust Corporate and Fund Services, LLC ("IT"), a financial services company whose principal place of business is 200 Prins Bernhardplein Amsterdam, Netherlands, 1097 JB; JPMorgan Chase & Co., dba JPMorgan Chase Bank ("JPMC"), a financial services company whose principal place of business is at 270 Park Ave 31st Floor, New York, NY 10017; KeyCorp, dba KeyBank National Association ("KeyBank"), a financial services company whose principal place of business is 127 Public Sq, Cleveland, OH 44114; PNC Financial Services Group, Inc., dba PNC Bank ("PNC"), a financial services company whose principal place of business is 300 Fifth Avenue Pittsburgh, PA 15222; and Columbia Banking System, Inc. as successor to Umpqua Holdings Corporation ("Umpqua"), a financial services company whose principal place of business is 445 SE Main, Roseburg, OR 97470, (collectively "Defendants" or "Defendant Banks"), and alleges on personal knowledge, investigation of his counsel, and information and belief as follows:

**CLASS ACTION COMPLAINT** – Page 3 of 54

## NATURE OF ACTION

7. From as early as October 2017 up until May 2022, Sam Ikkurty ("Ikkurty"), a Portland, Oregon resident and his business partner Ravishankar Avadhanam ("Avadhanam"), operated a cryptocurrency Ponzi Scheme from Ikkurty's apartment in Portland.

8. Ikkurty and Avadhanam marketed the supposed investment offerings by posting publicly accessible videos on YouTube and hosting online information sessions for potential investors to learn about the investment opportunities.

9. It was through the online marketing and virtual information sessions, hosted from Ikkurty's residence, that Amit learned of Ikkurty and Avadhanam, along with Ikkurty's company Jafia (collectively "Jafia Group").

10. Ikkurty and Avadhanam told potential investors about several investment offerings in these sessions, which were to be made through funds and LLCs Ikkurty and Avadhanam managed, such as Rose City Income Fund II, LP ("Rose City"), Seneca Ventures, LLC ("Seneca"), and Jafia, LLC ("Jafia").

11. The Jafia Group operated several other LLCs as part of the Scheme, including but not limited to, MySivana, LLC, an LLC controlled by Ikkurty ("MySivana") and Merosa Ventures, LLC, an LLC controlled by Avadhanam ("Merosa").

**CLASS ACTION COMPLAINT** – Page 4 of 54

12. The Jafia Group deceived investors about the actual operation of the Jafia Group as investors were unable to view the internal financial structure of the company to see it was operating as a Ponzi Scheme.

13. To perpetrate the Scheme, Ikkurty and Avadhanam opened multiple bank accounts with Defendants between August 2020 and May 2022.

14. Unlike investors, the Defendant Banks had a clear view of the Scheme the Jafia Group was operating, and rather than trying to put an end to it, they instead decided to profit.

15. In August 2020, Ikkurty opened an Umpqua account for Jafia; next Avadhanam opened a PNC account for Seneca in April 2021, then the next month, in May 2021, Ikkurty opened a Silvergate account for Rose City. This was followed by Ikkurty and Avadhanam opening a JPMC account for Seneca in June 2021. Ikkurty and Avadhanam then opened an Evolve account for Seneca in December 2021. At some point, Ikkurty and/or Avadhanam also opened accounts with KeyBank and IT.

16. The Jafia Group opened additional accounts with Defendants between August 2020 and March 2022.

17. The Jafia Group promised investment profits, obtained mainly through trading Crypto Currency, when in actuality, existing investors were paid through new investors' contributions.

18. Amit was convinced to invest in the spring of 2021.

**CLASS ACTION COMPLAINT** – Page 5 of 54

19. On or about March 1, 2021 Amit invested $100,000 through a Subscription Agreement in Rose City, which has a principal place of business in Portland, Oregon.

20. He followed the wire instructions on page two of the Subscription Agreement and wired the funds to Rose City's account at KeyBank, and subsequently received a confirmation from IT, Rose City's Fund Administrator.

21. If Amit had wanted to contribute additional capital to his Rose City investment, he was instructed in the Subscription Agreement to wire funds to Rose City's KeyBank account.

22. Amit invested a further $250,000 in the Jafia Group, this time through a Promissory Note in Jafia, LLC. It is unclear into which Defendant bank these funds were deposited.

23. For the first year, Amit was getting scheduled payments for both his investment in Rose City and the Jafia Promissory Note.

24. The scheduled monthly payments for the Rose City Investment came from IT.

25. The payments for the Jafia Promissory Note came from Umpqua, in the form of predated checks from Jafia's Umpqua account.

26. The Umpqua checks were labeled "Interest Payment," and 24 checks were signed and given to Amit by Ikkurty with the intention of Amit depositing them monthly from April 2021 through March 2023.

27. When Amit attempted to cash the Umpqua check in May 2022, his personal bank notified him that the check had not cleared, which was the first time Amit became aware of issues with the Jafia Group.

28. Amit was not the only investor who fell victim to the Jafia Group's Scheme, rather, in a complaint against the Jafia Group, the Commodity Futures Trading Commission ("CFTC") alleged the Jafia Group amassed $44 million from 170 investors during the perpetration of the Scheme.

29. The Jafia Group's Scheme was directly facilitated by Defendants, via the Jafia Groups' bank accounts the Defendants' held.

## DEFENDANT BANKS' REGULATORY AND COMPLIANCE OBLIGATIONS

30. Defendant Banks are obligated to know their customers and monitor their accounts for suspicious activity and to maintain internal control systems to prevent bank services from being misused to carry out illegal activity, particularly financial fraud and money laundering.

31. In connection with such obligations, Defendants employ sophisticated electronic monitoring systems to identify banking transactions or patterns that raise "red flags" that are indicative of potentially improper or illegal activity.

32. Federal regulations, including 12 C.F.R. § 21.21, require Defendant Banks to develop, administer, and maintain programs to ensure compliance with federal Anti-Money-Laundering ("AML") laws. The

**CLASS ACTION COMPLAINT** – Page 7 of 54

programs must be approved by the bank's boards of directors and must: (i) provide for a system of internal controls to ensure compliance at all times, (ii) provide for independent testing of the bank's ongoing compliance, (iii) designate an individual to coordinate and monitor compliance, and (iv) provide training for appropriate personnel.

33. Defendant Banks must also develop customer due diligence programs to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The customer due diligence programs allow banks to maintain awareness of the financial activity of their customers and the ability to predict the type and frequency of transactions in which their customers are likely to engage.

34. Defendant Banks' customer due diligence programs must be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention the Banks pay. Where a customer is determined to be high risk, Banks must gather additional information about the customer and its accounts, including determining: (i) the purpose of the account; (ii) the source

of the funds; (iii) the proximity of the customer's residence to the bank; and (iv) explanations for changes in account activity.

35. Defendant Banks must also designate compliance officers who are senior bank officials responsible for coordinating and monitoring compliance with federal AML laws. The compliance officers must, in turn, designate individuals at each office or branch to monitor the bank's day-to-day compliance.

36. Defendant Banks also receive guidance from the Federal Financial Institutions Examination Council ("FFIEC"), which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct. Examples of these suspicious indicia relevant to the allegations in the instant case include, but are not limited to:

    i.    "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

    ii.    "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

    iii.    "Unusual use of trust funds in business transactions or other financial activity."

iv.   "A large volume of . . . funds transfers is deposited into . . . an account when the nature of the accountholder's business would not appear to justify such activity."

v.    "A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

vi.   "Goods or services purchased by the business do not match the customer's stated line of business . . . [or the] profile of the company provided by respondent bank or character of the financial activity; a company references remarkably dissimilar goods and services in related funds transfers; explanation given by foreign respondent bank is inconsistent with observed funds transfer activity."

vii.  "The stated occupation of the customer is not commensurate with the type or level of activity."

viii. "Customer makes high value transactions not commensurate with the customer's known incomes."

ix.   "Payments or receipts with no apparent links to legitimate contracts, goods or services are received."

x.    "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

**CLASS ACTION COMPLAINT** – Page 10 of 54

xi.  "Funds transfers contain limited content and lack related party information."

xii.  "A bank is unable to obtain sufficient information or information is unavailable to positively identify originators or beneficiaries of accounts or other banking activity (using internet, commercial database searches, or direct inquiries to a respondent bank)."

xiii.  "Funds transfers are sent or received from the same person to or from different accounts."

xiv.  "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

xv.  "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

xvi.  "Purpose of shell company is unknown or unclear."

xvii.  "Funds are sent or received via international transfers from or to higher-risk locations."

37. Consistent with FFIEC guidance, Defendant Banks maintain systems of controls sufficient to identify broad patterns, sometimes across multiple accounts. The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities are all subject to examination.

**CLASS ACTION COMPLAINT** – Page 11 of 54

38. Defendant Banks contextualize their scrutiny, analyzing suspicious activity against the backdrop of industry norms, as well as the customers' own backgrounds. Defendant Banks are expected to use sources of information like the internet, commercial database searches, and direct inquiries to a respondent bank, to ascertain the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

39. Defendant Banks collect and maintain information about their customers and their banking behaviors in order to, among other things, detect and prevent money laundering and fraud and to protect themselves from third party liability and reputational harm.

40. As required by Federal law, Defendant Banks maintain procedures to know the identity of each customer, collect information about the holder of each account, and understand a customer's banking behavior. See 31 C.F.R. §§ 1020.220(a)(1), (2). When an entity rather than an individual opens an account, the banks obtain information about the individual with control of the account. *Id*.

41. The information that Defendant Banks collect about new business account clients includes the purpose and nature of the business, anticipated activity in the account, where the customer expects to transact business, and the products and services commonly used by the customer.

**CLASS ACTION COMPLAINT** – Page 12 of 54

42. Using the information collected, as well as external resources like internet search engines and public and commercial record databases, Defendant Banks create an initial client profile and assign a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When a Defendant Bank becomes aware that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account.

43. Defendant Banks also maintain internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

44. Through these programs, Defendant Banks obtain information that gives them an understanding of the unique financial activity of their customers. Likewise, Defendant Banks can predict the type and frequency of transactions in which their customers are likely to engage, including the dollar volume and transaction volume typical

of each account. This knowledge is used to identify unusual and suspicious transactions.

45. Defendant Banks also make employee compliance with applicable banking regulations and knowledge of AML guidelines a condition of employment and incorporates them into job descriptions and performance evaluations. The banks give AML training to all operational personnel whose duties may require such knowledge, including tellers and wire room personnel, to enable them to recognize indicia of money laundering and fraud in the course of their work. In addition, supervisory personnel, specifically designated by Defendant Banks' chief compliance officers, oversee the day-to-day implementation of the banks' risk management framework at the individual branches.

46. Complementing the human effort are Defendant Banks' advanced transaction monitoring software portfolios, which include artificial intelligence and data analytics software platforms. These software platforms can reveal hidden connections and relationships between transacting parties across accounts and transactions.

47. Defendant Banks' advanced transaction monitoring software portfolios automatically review transactions against customers' backgrounds and transaction histories, compare account activity against AML and other compliance red flags, and automatically

detect and analyze abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

48. Moreover, the size, shape, and speed of the Jafia Group's account activity strongly suggests that Defendant Banks assigned account managers, relationship managers, or equivalent to the Jafia Group.

49. Defendant Banks permitted and at times facilitated the Jafia Group and its agents' use of Defendant Banks' accounts to carry out unlawful activity despite knowing that the Jafia Group and its agents were abusing the banks' services including, but not limited to, by:

     i. Taking in large deposits obviously constituting deposits from investors and designated for investment purposes on their face;

     ii. Transferring hundreds of thousands of dollars from those same accounts holding investor funds back to investors in routine sequence, which obviously constituted interest or distribution payments;

     iii. Disbursing funds for non-legal purposes such as the commingling and misappropriation of investor funds into the coffers of Jafia Group's principals and affiliates.

**CLASS ACTION COMPLAINT** – Page 15 of 54

50. Many of the Jafia Group's transactions were in large, round number, and often-repeated dollar amounts, a transfer pattern indicative of money-laundering activities.

51. This was all done without indicators of normally-expected activity in the bank accounts of a legitimately and lawfully functioning crypto currency investment company.

52. The account activity and account statements visible to Defendant Banks reflected these improper transactions using investor funds by the Jafia Group and its agents.

53. Despite being privy to these and other signs of wrongdoing set forth in more detail in the complaint, Defendant Banks did not terminate their relationship with the Jafia Group or take steps to stop its fraudulent Scheme. Instead, Defendants continued to serve the Jafia Group and facilitate improper transfers of investor funds that allowed the Jafia Group to continue to operate its Scheme for many years. Defendants knew the Jafia Group was using accounts with their institutions for improper purposes but allowed the Jafia Group to pay purported "interest" or "distributions" which were in fact just new investor money and allowed Jafia Group principals and affiliates to enrich themselves through direct payments from Defendant Bank accounts and through other self-dealing and insider transactions detailed in this complaint.

**CLASS ACTION COMPLAINT** – Page 16 of 54

## JURISDICTION AND VENUE

54. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $40,000,000, in the aggregate, exclusive of interest and costs, and the number of claimants exceeds 150 persons.

55. This Court has personal jurisdiction over Defendant Umpqua as it maintains its principal place of business in the State of Oregon. As such, it has purposefully availed itself of and established minimum contacts with the State.

56. This Court has personal jurisdiction over Defendants Evolve, IT, JPMC, KeyBank, and PNC, because all do regular business in and have established minimum contacts with the State of Oregon. All Defendants conducted online business directed at customers in Oregon. Additionally, Evolve operates a location in Bend, Oregon; JPMC operates over 50 branches in Oregon; and KeyBank operates 63 branches in Oregon.

57. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendants' unlawful course of conduct occurred in large part in this District.

## PARTIES

**58.** Plaintiff Amit Fatnani is and was at all times mentioned in the complaint, a citizen of the State of California, and currently resides in that state. On or about March 1, 2021, Amit made his first investment with the Jafia Group, the $100,000 Rose City Investment. Subsequently, on or about March 17, 2021, Amit, invested $250,000 in the Jafia Promissory Note.

**59.** Defendant Evolve Bank and Trust is a financial services company based in Memphis, Tennessee. Evolve operates across the United States, including a branch in Bend, Oregon. Evolve housed bank accounts for Seneca and Jafia.

**60.** Defendant InterTrust Group B.V. is a trust and corporate management company based in Amsterdam, Netherlands. IT has several physical locations in the United States and does business across all 50 States. The US location listed on IT documents related to the Jafia Group is 80 Cottontail Lane, Suite 430, Somerset, NJ 08873. IT housed bank accounts for Rose City and potentially other Jafia Group related funds and acted as Rose City's Fund Administrator, Registrar, and Transfer Agent, according to Jafia Group marketing documents.

**61.** Defendant JPMorgan Chase and Co. is an investment bank and financial holding company based in New York, New York. JPMC

operates across the United States, with over 50 branch locations in Oregon. JPMC housed at least two bank accounts for Jafia, a bank account for MySivana and an account for Merosa. JPMC also holds a safe deposit box for Ikkurty at the Hillsboro, Oregon location.

62. Defendant KeyCorp is a bank and financial services company, operating through their subsidiary KeyBank, based in Cleveland, Ohio. KeyBank operates across the United States, with 63 branch locations in Oregon. KeyBank housed at least four bank accounts for the Jafia Group, holding at least one bank account for Rose City, two for Sam Ikkurty, and one for Seneca.

63. Defendant PNC Financial Services is a financial holding company based in Pittsburgh, Pennsylvania. PNC housed at least one, if not multiple accounts for Seneca and other Jafia Group entities.

64. Defendant Umpqua Holdings Corporation is a financial holding company based in Portland, Multnomah County, Oregon. Umpqua's corporate headquarters is located at 445 SE Main, Roseburg, OR 97470. Umpqua operates over 200 locations, 72 of which are in Oregon. Umpqua housed at least five bank accounts for the Jafia Group, including accounts for Jafia, Ikkurty, Ikkurty Capital, and MySivana.

## FACTUAL ALLEGATIONS

### Ikkurty and Avadhanam Initiate a Ponzi Scheme

65. Ikkurty, from his residence in Portland, Oregon, alongside his business partner, Avadhanam, created and marketed investment offerings to the public.

66. To market the offering, Ikkurty and Avadhanam used RoseCityFund.com, a publicly accessible site, which stated that they began operations on October 1, 2017 with their first fund, Rose City Income Fund I.

67. Ikkurty and Avadhanam solicited investors from across the country via YouTube and virtual information sessions, with the hub of operations in Ikkurty's Portland living room.

68. Ikkurty and Avadhanam, members of the Indian American community, focused on recruiting Indian American investors, relying on community associations to sow trust.

69. The Limited Partnership agreements to invest in Rose City stated that the investors' money would be used to "invest, hold and trade" different types of digital and crypto currencies.

70. To operate the Scheme and feign legitimacy, Ikkurty and Avadhanam relied on Defendants to accept and send payments to and from investors, along with holding money for and transferring money between the Jafia Group's accounts.

**CLASS ACTION COMPLAINT** – Page 20 of 54

## Ikkurty Opens an Umpqua Bank Account

**71.** On or about August 24, 2020, Ikkurty opened a bank account for Jafia, LLC at Umpqua.

**72.** At some point after opening the account, Umpqua issued Ikkurty a checkbook, with Jafia's address listed as 7028 West Waters Ave. Apt 145, Tampa, FL 33634.

**73.** A google search reveals that the Tampa address is not a place from which a business could be operated, but rather is a P.O. Box located inside a UPS Store, and neither Ikkurty nor Avadhanam had any connections to Florida.

**74.** Between July 2021 and March 31, 2022, $23,908,802 was deposited into the Umpqua account.

**75.** In the same period, Ikkurty transferred $5,650,000 to accounts for Ikkurty Capital and $1,000,000 to accounts for Jafia.

**76.** In the same period, Ikkurty transferred $8,650,000 to Genie Technologies Pte Ltd, a Singaporean technology company and affiliate of ZebPay.com, a cryptocurrency exchange, from the Umpqua account.

**77.** As of July 11, 2022, Umpqua housed the following accounts with the following balances:

    **i.** Ikkurty Capital LLC XXXX7824, $29,459.88

    **ii.** Ikkurty Capital LLC XXXX8773, $0.00

    iii.   Sam Ikkurty XXXX1238, $3,223.12

    iv.   Sam Ikkurty, MySivana LLC XXXX5860, $1,951.20

    v.   Jafia LLC XXXX5384, $3,640,695.12

**Avadhanam Opens a PNC Bank Account**

78. On or about April 15, 2021, Avadhanam opened a PNC account for Seneca and listed himself as the sole signer for the account.

79. Seneca Ventures was incorporated in the state of Wyoming the day before, on April 14, 2021, though Avadhanam and Ikkurty have no connection to Wyoming.

80. The Seneca business address was listed on the application documents as 30 N Gould St STE R Sheridan, WY 82801. This address was also used for the registered agent address, and Registered Agents, LLC was listed as the registered agent. Through a google search, it becomes immediately apparent that this Wyoming address has been associated with multiple alleged investment frauds.

81. 21 commercial registered agents have offices at 30 N. Gould St and over 53,000 business are registered there. To add perspective, Wyoming's population in 2020 was about 580,000 people.

82. Seneca's corporate filings now list the officer as Nexus Management Group US Ltd, a company ran by Roy Vargis, attached to an expired website link, indiancpa.com.

**CLASS ACTION COMPLAINT** – Page 22 of 54

83. Seneca was not registered with the SEC or CFTC.

84. Between April 15, 2021 and June 4, 2021, at least 24 investors deposited a total of $1,707,000 into the PNC account.

85. Investors wrote memos such as "investment," "investment Rose City," "Rose City Fund II," "ATTN: Ravishankar Avadhanam, Sam," on the deposits.

86. Ikkurty and Avadhanam deposited two investments, totaling in $36,666, in the PNC account, between April 15, 2021 and June 4, 2021.

87. During the same time frame, a total of $1,686,829 was transferred from the PNC account to Rose City. The transfers were made using a wire and cashier's checks, made payable to "Rose City Income Fund II."

88. The PNC Bank account was closed in June 2021.

### Ikkurty Opens a Silvergate Bank Account

89. On or about May 18, 2021, Ikkurty opened an account at Silvergate Bank, a now defunct financial institution. This was a business account for Rose City. Ikkurty listed himself as the sole Principal, Officer, and authorized agent.

90. On the Silvergate account application, Ikkurty listed Rose City's physical street address and business mailing address, as 10340 NW Engleman St. Portland, OR 97229. Ikkurty also checked the box

stating the business operated out of a home and listed his home address as the operating location later in the application.

91. Ikkurty listed the number of physical locations associated with Rose City as "one" on the Silvergate application, presumably he was referring to the Portland address.

92. Ikkurty labeled Rose City as a hedge fund on the Silvergate application and included "trading" as the purpose of the account. For the anticipated account activity, Ikkurty listed "Funds In/Out from Operating Account (LP Subscriptions)/ wires to/from exchanges (Coinbase Pro) to buy crypto assets," and added the funds would be coming "from selling limited partnership interests."

93. Ikkurty filled out the application stating that Rose City was not registered with the SEC or the CFTC.

94. On the Silvergate application, Ikkurty listed that Jafia, LLC was Rose City's parent company and that Jafia's location was 7028 West Waters Ave. Apt 145, Tampa, FL 33634, the Tampa UPS P.O. Box referenced *supra*.

95. Between May 18, 2021 and March 31, 2022, at least 78 investors deposited a total of at least $32,307,846 into the Silvergate account.

96. During the same timeframe, Ikkurty deposited $10,621,162 through Seneca from PNC and JPMC accounts into the Silvergate account.

97. Ikkurty transferred money from the Silvergate account into other accounts in the name of the Jafia Group and the funds controlled by the Jafia Group within the same period, including a $23,908,892 transfer to an account for Jafia and $860,502 to a JPMC account for the Jafia Group.

98. From the Silvergate account, Ikkurty sent $9,200,000 to the Singaporean company, Genie Technologies, referenced *supra*.

99. The Jafia Group used the Silvergate account to make distributions to investors in Rose City, sending approximately $5,846,720 from the Silvergate account to investors between May 2021 and March 2022.

100. Investors were promised 15% monthly distributions by the Jafia Group. Silvergate sent the 15% distributions during the time period the Scheme was operational. The funds in these distributions were furnished by other investors' deposits.

101. Investor funds and the Jafia Group's additional bank accounts were the only source of deposits into the Silvergate account. Most, if not all, of the additional bank accounts had also been funded by investors.

102. As of July 11, 2022, Silvergate housed the following accounts with the following balances:

    **i.**    Rose City Income Fund II LP XXXX4009, $3,236,948.61

     **ii.**    Ikkurty Capital LLC DBA Rose City Income Fund, XXXX6682 $582,214.55

     **iii.**   Ikkurty Capital LLC DBA Rose City Income Fund, XXXX6690 $0.00

     **iv.**   Jafia LLC XXXX8316, $26,421.60

**Ikkurty and Avadhanam Open a JPMC Bank Account**

103.   On or about June 14, 2021, Ikkurty and Avadhanam opened a JPMC business checking account for Seneca, which they described as a "technology consulting firm in software programming," in the application documents.

104.   Between June 14, 2021 and January 26, 2022, at least 122 investors deposited a total of least $10,400,000 into the JPMC account.

105.   Investors wrote memos such as "investment," "initial investment," and "additional investment," on their wire transactions with JPMC.

106.   The other deposits into the account during the same timeframe were transfers from bank accounts in the name of "Rose City Fund II LP."

107.   Ikkurty and Avadhanam transferred $9,916,333 from the JPMC account to an account for Rose City during the timeframe.

108.    Ikkurty and Avadhanam sent a total of $543,428 from the JPMC account to an account for Seneca during the timeframe.

109.    As of July 11, 2022, JPMC housed the following accounts with the following balances:

    **i.**    Jafia LLC XXXX2813, $100,729.32

    **ii.**    Jafia LLC XXXX2869, $29.53

    **iii.**    MySivana LLC XXXX6986, $44,822.77

    **iv.**    Merosa Ventures LLC XXXX6073, $1,704.32

    **v.**    Safe Deposit Box - Sam Ikkurty (contents not confirmed) SDB #9112 held at Tanasbourne branch at 11190 NE Evergreen Pkwy, Hillsboro, OR 97006.

**Ikkurty and Avadhanam Open an Evolve Bank Account**

110.    On or about December 9, 2021 Ikkurty and Avadhanam opened an Evolve account for Seneca.

111.    Between December 22, 2021 and March 31, 2022 investors' funds were deposited into the Evolve account. The Jafia Group and the funds the group controlled also deposited money into the account. In total, $5,654,081 was deposited into the Evolve account.

112.    The money in the Evolve account was distributed to investors and the Jafia Group, as well as funds controlled by the Jafia Group.

113.    As of July 11, 2022, Evolve housed the following accounts with the following balances:

**CLASS ACTION COMPLAINT** – Page 27 of 54

    i.    Seneca Ventures LLC XXXX1329, $491,668.77

    ii.    Jafia LLC XXXX6613, $1,684,536.56.

**Ikkurty and Avadhanam Open an IT Bank Account**

114.    At some point, most likely in 2021, Ikkurty and/or Avadhanam opened an account with IT.

115.    In a presentation distributed to potential investors, the Jafia Group lists IT as Rose City's Fund Administrator.

116.    In its position as Fund Administrator, IT sent out monthly distributions and statements for Rose City Income Fund II, LP to investors.

117.    IT listed its address on the distributions as 80 Cottontail Lane, Suite 430, Somerset, NJ 08873.

118.    The Rose City Subscription agreement gives the following instruction:

> send completed and executed copies of the documents […] and all attachments and any required supporting documentation to Intertrust Group, Attn: Michael Secondo, by e-mail to Michael.Secondo@intertrustgroup.com, no later than one (1) Business Day before JAFIA LLC (the "General Partner") elects to accept this capital contribution (the "Admission Date").

119.    IT may still hold bank accounts for the Jafia Group, but the account number(s) and balance(s) are not known by Plaintiff.

## Ikkurty Opens a KeyBank Bank Account

120.   At some point, most likely in 2021, Ikkurty opened an account with KeyBank, and subsequently opened additional accounts.

121.   The Jafia Group instructed investors to send funds for investing in Rose City to the KeyBank account XXXX2139.

122.   The Jafia Group had at least five accounts with KeyBank, and all the accounts were connected to Sam Ikkurty, as either the signer or sole owner.

123.   On August 5, 2021, one of the KeyBank accounts, for Rose City Income Fund II, dba Rose City Income fund, XXXXX5544 closed.

124.   As of July 11, 2022 KeyBank housed the following accounts with the following balances:

    **i.**   Rose City Income Fund II LP XXXX2139, $84,978.17

    **ii.**   Sam Ikkurty XXXX5888, $1,000.12

    **iii.**   Sam Ikkurty XXXX5805, $5,000.00

    **iv.**   Seneca Ventures LLC XXXX9381, $2,187.50.

## The Jafia Group Files with the SEC

125.   The Jafia Group began soliciting sales for Rose City Income Fund II on or about January 1, 2021.

126.   On January 27, 2021, Ikkurty filed a Form D "Notice of Exempt Offering of Securities" with the SEC and listed 506(b) as the exemption he was filing under.

127.    On the 2021 filing, Ikkurty indicated that there had yet to be any sales.

128.    On January 27, 2022 Ikkurty filed an amendment to the Form D.

129.    The SEC explicitly states that offerings exempt from registration under 506(b) are subject to the requirement of "no general solicitation or advertising to market the securities."

130.    The SEC defines general solicitation as "advertisements published in newspapers and magazines, public websites, communications broadcasted over television and radio, and seminars where attendees have been invited by general solicitation or general advertising."

131.    The Jafia Group blatantly disregarded this directive through their online marketing, by creating a publicly accessible website, RoseCityFund.com, which included publicly accessible investment documents, posting publicly accessible YouTube videos, a publicly accessible LinkedIn page, and operating a publicly accessible Instagram with the handle @RoseCityFund.

132.    The Jafia Group further disregarded the directive of no general solicitations by soliciting investors at seminars including but not limited to a November 2021 conference for the Greater Washington Association of Physicians of Indian Origin ("GWAPI").

133. On the Form D and Form D/A, Ikkurty listed Rose City's Principal Place of Business and Contact Information as 7028 West Waters Ave, Suite 145, the UPS Store P.O. Box discussed *supra*.

134. On both filings Ikkurty listed Jafia LLC as a related person, indicating the LLC was a General Partner and Investment Manager, and for Jafia's address, he listed the UPS Store P.O. Box.

135. Ikkurty listed the minimum investment as $100,000 on both filings.

136. Ikkurty listed himself as the managing member of the general partnership on both filings.

137. Ikkurty listed the total amount sold as $47,392,245 on the 2022 amendment and listed that 93 total investors had invested, 6 of whom were non-accredited.

138. The offering amount and remaining amount to be sold were listed as indefinite on both filings.

### Defendant Banks Must Have Known or Recklessly Disregarded Red Flags of the Jafia Group's Ponzi Scheme

139. Federal regulations, including 12 C.F.R. § 21.21, require banks to develop, administer, and maintain a program to ensure compliance with federal Anti-Money-Laundering laws. AML programs must (a) provide a system of internal controls to ensure compliance at all times, (b) provide for independent testing of the bank's ongoing

compliance, (c) designate an individual to coordinate and monitor compliance, and (d) provide training for appropriate personnel.

140.   Each Defendant, due to mandatory obligations to comply with governmental banking laws and regulations, either (a) must have known that the Jafia Group Securities were being sold to investors in violation of Oregon securities laws, or (b) in the alternative, disregarded due to recklessness or gross negligence that the Jafia Group Securities were being sold to investors in violation of Oregon securities laws.

141.   Each Defendant had internal controls in place that were capable of detecting – and must have detected – the Jafia Group's cryptocurrency Ponzi Scheme, including a customer identification program; customer due diligence processes; account opening and monitoring procedures; ongoing training for employees; and automated account monitoring systems.

142.   Pursuant to mandated compliance procedures requiring each Defendant to "know its customer," each Defendant possessed information before or at the time each of the Jafia Group Bank Accounts were opened that the Jafia Group and/or its agents, including, without limitation, Ikkurty and Avadhanam, were supposed to be engaged in securities investment transactions.

**CLASS ACTION COMPLAINT** – Page 32 of 54

143.    Moreover, once the Jafia Group Bank Accounts were opened, each Defendant, due to ongoing account monitoring policies and procedures, must have detected, or disregarded with recklessness or gross negligence, transactions in the Jafia Group Bank Accounts that showed (a) recently deposited investor money in the Jafia Group Bank Accounts being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam being used for reasons other than in furtherance of Jafia Group investment purposes.

144.    Due to governmentally mandated initial and ongoing due diligence obligations for banks, each Defendant further had detected, or disregarded with recklessness or gross negligence, that (a) the Jafia Group was selling unregistered securities to investors, (b) agents of Jafia Group entities, including Ikkurty and Avadhanam, were not licensed to solicit and sell securities, and/or (c) the Jafia Group and its agents were selling securities to investors by making untrue statements of material facts and by omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

145.    In tandem with federal regulations, banks receive guidance from the FFIEC, which outlines "red flags" that indicate possible money

laundering schemes and other misconduct mandating further inquiry, many of which were present, such as (a) Ikkurty and Avadhanam kept close control over the bank accounts and management of the Jafia Group, (b) the Jafia Group did not use outside accounting firms to manage or audit its finances and never provided Defendants with independent audit reports, (c) the Jafia Group exploited their shared affinity with the Indian-American community, (d) the Jafia Group transferred funds to offshore accounts or entities, and (e) the Jafia group made many "large, round dollar" transactions.

**Amit Invests in the Jafia Group**

146.   In 2021, Amit Fatnani heard about investment opportunities offered by the Jafia Group, which promised investment profits, obtained mainly through trading Crypto Currency.

147.   The Jafia Group acquired investors by hosting online presentations along with circulating investment information, such as pitch decks and YouTube videos.

148.   The online presentations were hosted from Portland, Oregon by Ikkurty, and the pitch decks and YouTube videos were recorded in and disseminated from Portland by Ikkurty.

149.   The YouTube videos were available for the public to view up until at least April 26, 2022.

**CLASS ACTION COMPLAINT** – Page 34 of 54

150.  The Jafia Group also ran RoseCityFund.com, a LinkedIn, and an Instagram, through which they solicited investors.

151.  The Jafia Group exploited their shared affinity with investors, marketing heavily towards the Indian American demographic, and attending conferences geared towards this group, such as GWAPI, a professional organization for Physicians of Indian Origin, and visiting clubs at UC Berkley affiliated with Indian American students.

152.  Amit, an Indian American himself, attended one of the Jafia Group's prospective investor presentations, reviewed the investment materials, and was convinced to invest.

153.  On or about March 1, 2021 Amit invested $100,000 in Rose City by following the instructions in the Subscription agreement, which asked investors to wire money to KeyBank and send a Subscription Agreement, Limited Partnership Agreement, and W-9 to IT.

154.  Amit wired the funds to Rose City's account with KeyBank, XXXXXXXX2139 and sent IT the necessary information.

155.  Amit received a confirmation of investment from IT on March 31, 2021, listing the transaction date as March 1, 2021. The confirmation was signed by "Intertrust Corporate and Fund Services LLC" as "Registrar and Transfer Agent of Rose City Income Fund II LP."

156. Amit invested a further $250,000 in the Jafia Group, this time through the Jafia Promissory Note.

157. Along with the Jafia Promissory Note, Amit received an interest payment schedule, outlining monthly $5,000 payments to be made from April 2021 through March 2023.

158. Rather than issue checks or make the monthly payments as they came due, Ikkurty provided Amit with all 24 interest payment checks at once, dated for each month through March 2023 on the Umpqua checks.

159. The Umpqua checks made out to Amit were sequential, the first of which was labeled 165, and the last 189.

160. The Umpqua checks labeled 165 through 177 cleared in Amit's bank account.

161. Ikkurty signed the Umpqua checks, and all the checks were labeled "Interest Payment" and included the number of which interest payment the check was for.

### Jafia's Check Bounces

162. On or about May 20, 2022, Amit received a letter from Bank of America, his personal bank, notifying him that an item deposited to his account on May 18, 2022 would be returned unpaid.

**CLASS ACTION COMPLAINT** – Page 36 of 54

163.    The letter from Bank of America, referenced a check for $5,000 from Umpqua, written to Amit by Jafia and signed by Ikkurty, dated May 17, 2022, and listed as "Interest Payment 14."

164.    Prior to getting this notice, Amit had deposited 13 checks, each for $5,000, from Jafia's Umpqua account without issue.

## The CFTC Enforcement Action

165.    On or about May 19, 2022 the CFTC filed a civil enforcement action in the U.S. District Court for the Northern District of Illinois against the Jafia Group.

166.    The civil enforcement action charged Ikkurty and Avadhanam with "fraudulently soliciting at least $44 million for participation interests in a so-called income fund invested in digital assets and other instruments."

167.    The CFTC alleged that the Jafia Group solicited the funds from at least 170 participants and that participants' investments were supposed to be put towards trading digital assets, commodities, derivatives, swaps, and commodity futures contracts, but instead of investing the pooled participant funds as represented, the Jafia Group misappropriated participant funds by distributing them to other participants, in a manner akin to a Ponzi Scheme.

168.   The enforcement action additionally charged the Jafia Group with "operating an illegal commodity pool and failing to register as a Commodity Pool Operator."

169.   The CFTC named three relief defendants, funds owned and operated by Ikkurty, Jafia, and Avadhanam, Ikkurty Capital, LLC d/b/a Rose City Income Fund, Rose City Income Fund II, LP and Seneca Ventures, LLC.

**Defendant Banks Participated and Materially Aided
in the Sale of Jafia Group Securities**

170.   Each of the Defendants participated and materially aided Ikkurty and Avadhanam in selling the Jafia Group Securities to Amit and the Class, thereby perpetuating the Ponzi Scheme.

171.   Each Defendant provided bank accounts to Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam with the understanding those bank accounts were related to the Class' investments in the Jafia Group Securities (the "Jafia Group Bank Accounts").

172.   In the course of opening and maintaining the Jafia Group Bank Accounts, each Defendant participated and materially aided in recently deposited investor money in the Jafia Group Bank Accounts being used to fund outgoing payments to existing investors.

173.   In the course of opening and maintaining the Jafia Group Bank Accounts, each Defendant participated and materially aided in the

Jafia Group Bank Accounts transferring recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam being used for reasons other than in furtherance of Jafia Group investment purposes.

174.    Umpqua's participation and aid were critical to the success of the sale of the Jafia Group Securities to the Class by Ikkurty and Avadhanam. Umpqua received and deposited in several Jafia Group Bank Accounts approximately $23 million in funds that the Class invested in the Jafia Group Securities between July 2021 and March 2022. Umpqua participated and materially aided in multiple transfers to and from these Jafia Group Bank Accounts that facilitated: (a) recently deposited investor money in the Jafia Group Bank Accounts being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam being used for reasons other than in furtherance of Jafia Group investment purposes.

175.    PNC's participation and aid were critical to the success of the sale of the Jafia Group Securities to the Class by Ikkurty and Avadhanam. PNC received and deposited in several Jafia Group Bank Accounts at least $1.7 million in funds that the Class invested

in the Jafia Group Securities between April 2021 and June 2021. PNC participated and materially aided in multiple transfers to and from these Jafia Group Bank Accounts that facilitated: (a) recently deposited investor money in the Jafia Group Bank Accounts being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam being used for reasons other than in furtherance of Jafia Group investment purposes.

176.    Silvergate received and deposited in several Jafia Group Bank Accounts approximately $32 million in funds that the Class invested in the Jafia Group Securities between May 2021 and March 2022. In addition, Silvergate received and deposited into its Jafia Group Bank Accounts over $10 million from other Jafia Group Bank Accounts at PNC and JPMC of which some, if not all, had also been funded by the Class.

177.    JPMC's participation and aid were critical to the success of the sale of the Jafia Group Securities to the Class by Ikkurty and Avadhanam. JPMC received and deposited in several Jafia Group Bank Accounts approximately $10.4 million in funds that the Class invested in the Jafia Group Securities between June 2021 and January 2022. JPMC participated and materially aided in multiple

transfers to and from these Jafia Group Bank Accounts that facilitated: (a) recently deposited investor money in the Jafia Group Bank Accounts being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam being used for reasons other than in furtherance of Jafia Group investment purposes.

178.    Evolve's participation and aid were critical to the success of the sale of the Jafia Group Securities to Amit and the Class by Ikkurty and Avadhanam. Evolve received and deposited in several Jafia Group Bank Accounts approximately $5.6 million in funds that the Class invested in the Jafia Group Securities between December 2021 and March 2022. Evolve participated and materially aided in multiple transfers to and from these Jafia Group Bank Accounts that facilitated: (a) recently deposited investor money in the Jafia Group Bank Accounts being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam being used for reasons other than in furtherance of Jafia Group investment purposes.

179.    IT's participation and aid were critical to the success of the sale of the Jafia Group Securities to Amit and the Class by Ikkurty and

Avadhanam beginning in or about 2021. IT acted as the Fund Administrator of entities affiliated with the Jafia Group, including, without limitation, Rose City Income Fund II, LP. IT sent out monthly distribution and statements to Class investors in entities affiliated with the Jafia Group, including, without limitation, Rose City Income Fund II, LP. IT, through its employee and agent Michael Secondo, also received, accepted and reviewed the documentation of Class members to invest in Jafia Group Securities, including, without limitation, those securities offered by or through Rose City Income Fund II, LP.

180.    Key Bank's participation and aid were critical to the success of the sale of the Jafia Group Securities to the Class by Ikkurty and Avadhanam beginning in or about 2021. Key Bank received and deposited funds in several Jafia Group Bank Accounts that the Class invested in the Jafia Group Securities beginning in or about 2021. Key Bank participated and materially aided in multiple transfers to and from these Jafia Group Bank Accounts that facilitated: (a) recently deposited investor money in the Jafia Group Bank Accounts being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or

Avadhanam being used for reasons other than in furtherance of Jafia Group investment purposes.

**Defendant Banks' Material Participation**
**in the Sale of Jafia Group Securities**

181.    Defendant Banks facilitated the opening of many accounts owned and controlled by the Jafia Group, its affiliates, and its principals.

182.    As custodians of these bank accounts, Defendant Banks knew these bank accounts held investor funds.

183.    In addition to opening and maintaining the Jafia Group accounts, Defendant Banks facilitated the transfer of monthly distribution payments to Jafia Group investors. Defendant Banks knew that the funds they were distributing to existing investors were coming from accounts funded by new investor deposits.

184.    Similarly, Defendant Banks facilitated the transfer of investor funds to Jafia Group principals and their affiliates. As described in greater detail above, Defendant Banks facilitated the transfer of investor funds from Defendant Banks' accounts that held investor funds to accounts controlled by Ikkurty, Avadhanam, and others.

185.    Defendant Banks' participation was critical to the success of the Jafia Group's sales of securities to Plaintiff and the Class members.

## CLASS ACTION ALLEGATIONS

**186.**    Plaintiff incorporates by reference all other paragraphs of this complaint as if fully stated.

**187.**    Plaintiff brings this action individually and on behalf of all other persons similarly situated (referred to as "the Class") under Federal Rule of Civil Procedure 23.

**188.**    Plaintiff proposes the following Class definition(s), subject to amendment as appropriate:

i.    All persons who invested with Ikkurty, Avadhanam, or Jafia, LLC, either through:

a. Rose City Income Fund,

b. Rose City Income Fund II, LP,

c. Jafia, LLC,

d. MySivana, LLC

e. Merosa, LLC or

f. Seneca Ventures, LLC.

ii.    Whose funds were held within the Evolve, IT, JPMC, KeyBank, PNC, or Umpqua accounts and/or who were given interest payments or other payments from the Evolve, IT, JPMC, KeyBank, PNC, or Umpqua bank accounts, between August 24, 2020 and May 19, 2022.

189.    Plaintiff reserves the right to amend this Complaint to assert claims on behalf of additional classes or subclasses of investors in any of the other funds described in the complaint.

190.    Collectively, all these persons identified in the Class definition(s) above will be referred to as "Class members." Plaintiff represents, and is a member of, the Class.

191.    Excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, and Defendants' agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

192.    Plaintiff does not know the exact number of members in the Class, but reasonably believe that Class members number, at a minimum, to be 170. Further, the Class can be identified easily through records maintained by Defendants.

193.    The joinder of all Class members is impracticable due to the number of Class members. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class(es).

194.    The claims of Plaintiff are typical of the claims of the Class(es) he seeks to represent. Plaintiff and other Class members invested in the Jafia Group during the relevant time period. All of their investments were deposited in Defendants' accounts and the payments owed to them were made using Defendants' accounts, and as such, the claim of one investor is the same for all investors.

195.    There are well-defined, nearly identical, common questions of law and fact affecting all parties that predominate over questions that may affect individual Class members, including but not limited to the following:

i.    Whether Evolve, IT, JPMC, KeyBank, PNC, and/or Umpqua materially aided the Jafia Group in their perpetration of a Ponzi or Ponzi-like Scheme;

ii.    Whether Evolve, IT, JPMC, KeyBank, PNC, and/or Umpqua knowingly aided the Jafia Group in their perpetration of a Ponzi-like Scheme;

iii.    Whether Evolve, IT, JPMC, KeyBank, PNC, and/or Umpqua acted negligently in servicing and/or allowing the Jafia Group's account(s) held at Evolve, IT, JPMC, KeyBank PNC, and/or Umpqua to be used to further a Ponzi or Ponzi-like Scheme;

iv.   Whether Evolve, IT, JPMC, KeyBank, PNC, and/or Umpqua participated in the sale of unregistered securities;

v.   Whether Evolve, IT, JPMC, KeyBank, PNC, and/or Umpqua aided in the operation of an illegal commodity pool;

vi.   Whether Evolve, IT, JPMC, KeyBank PNC, and/or Umpqua was willfully or grossly negligent in servicing and/or allowing the Jafia Group's account(s) held at Evolve, IT, JPMC, KeyBank PNC, and/or Umpqua to be used to further a Ponzi or Ponzi-like Scheme.

196.   These and other common issues predominate over any individual issues. The focus of these claims is on the conduct of Defendants, which did not vary between class members. Resolution of these common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all Class members.

197.   For all these reasons, a class action is the superior method for the fair and efficient adjudication of this controversy.

198.   Plaintiff and members of the Class(es) have been harmed and/or continue to be harmed by the foregoing and other acts of Defendants.

199.   Plaintiff seeks damages on behalf of himself and all Class members, including but not limited to return of their investments,

with the interest the Jafia Group represented would be paid, as well as consequential damages in an amount to be proven at trial.

200.    Plaintiff will fairly and adequately represent and protect the interests of the Class and has no interests which are antagonistic to any member of the Class.

201.    Plaintiff has retained counsel experienced in handling class action claims involving fraud and securities violations. Plaintiff's counsel is also experienced in prosecuting the claims of investors against entities that have engaged in malfeasance with respect to investments.

202.    Class-wide relief is essential to resolve the claims regarding all potential investors relating to Defendants in an equitable, even-handed fashion.

203.    Plaintiff therefore seeks certification of the Class(es) under Rules 23(b)(1)(A) and (b)(3).

204.    Plaintiff seeks certification of a Rule 23(b)(1)(A) class. Adjudicating Defendants' liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendants if a class is not certified.

205.   Plaintiff seeks certification of a Rule 23(b)(3) class. As detailed above, common questions regarding Defendants' conduct predominate over any individual issues, and a class action is superior to the alternative of over a hundred individual cases involving the same core facts and claims addressed to Defendants' conduct.

206.   In the alternative, Plaintiff seeks certification of an "issues" class under Rule 23(c)(4). This class would incorporate, and allow for the adjudication of, all issues the Court adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiff in the above paragraphs.

**CAUSE OF ACTION**

**Violation of Oregon Securities Law
ORS 59.115(1) and (3) Against all Defendants**

207.    Plaintiff incorporates by reference and realleges all other paragraphs of this Complaint as if fully stated.

208.    Interests in securities were sold by the Jafia Group, Ikkurty and/or Avadhanam to Plaintiff and the Class in violation of ORS 59.115(1).

209.    Within three years before this action was commenced, the Jafia Group sold unregistered securities in violation of ORS 59.055 and 59.115(1)(a).

210.    All agents of Jafia Group entities, including Ikkurty and Avadhanam, were not licensed under the Oregon Securities Laws and solicited and sold securities in violation of ORS 59.055 and ORS 59.165.

211.    Within three years before this action was commenced, the Jafia Group, Ikkurty and Avadhanam sold securities in violation of ORS 59.135(2) and 59.115(l), by making untrue statements of material facts and by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiff and the Class did not know of the untruths or omissions and, in the exercise of reasonable care, could not have known of the untruths or omissions.

**CLASS ACTION COMPLAINT** – Page 50 of 54

212.    The Jafia Group, Ikkurty and Avadhanam sold securities, in violation of ORS 59.135(1) and (3) by (a) employing a scheme to defraud investors and (b) engaging in a course of business which operated as a fraud or deceit upon investors.

213.    Defendants are jointly and severally liable under ORS 59.115(3) because they participated in and materially aided unlawful sales of securities.

214.    Under ORS 59.115(2)(a), upon tender of the securities, Defendants are jointly and severally liable for the consideration paid for the securities, plus interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%, less any amounts Plaintiff and the Class received on the securities.

215.    Under ORS 59.115(10), Defendants should be required to pay the reasonable attorney fees of Plaintiff and the Class.

### **DEMAND FOR JURY TRIAL**

216.    Plaintiff demands a trial by jury on all counts so triable.

**CLASS ACTION COMPLAINT** – Page 51 of 54

## **<u>PRAYER FOR RELIEF</u>**

Plaintiff respectfully requests that the Court grant Plaintiff and all Class members the following relief against Defendants: **(i)** For all recoverable compensatory and other damages sustained by Plaintiff and the Class; **(ii)** For the rescission of all investments made by Plaintiff and the Class through Defendants; **(iii)** An award of attorneys' fees and costs to counsel for Plaintiff and the Class to the extent permitted by applicable law; **(iv)** An order certifying this action to be a proper class action under Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class; and **(v)** Such other relief as the Court deems just and proper.

May 15, 2023

**RESPECTFULLY FILED,**

s/ Michael Fuller
**Michael Fuller, OSB No. 09357**
Of Attorneys for Plaintiff
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
michael@underdoglawyer.com
Phone 503-222-2000

(additional counsel on next page)

**CLASS ACTION COMPLAINT** – Page 52 of 54

**Daniel B. Centner** (will seek admission pro hac vice)
Peiffer Wolf Carr Kane Conway & Wise, LLP
1519 Robert C. Blakes Sr. Drive
New Orleans, Louisiana 70130
dcentner@peifferwolf.com
Phone 504-523-2434
Fax 504-608-1465


**Grace A. Van Hancock** (will seek admission pro hac vice)
Peiffer Wolf Carr Kane Conway & Wise, LLP
1519 Robert C. Blakes Sr. Drive
New Orleans, Louisiana 70130
gvanhancock@peifferwolf.com
Phone 504-523-2434
Fax 504-608-1465


**Jason J. Kane** (will seek admission pro hac vice)
Peiffer Wolf Carr Kane Conway & Wise, LLP
95 Allens Creek Road, Bldg. 1 Suite 150
Rochester, New York 14618
jkane@peifferwolf.com
Phone 585-310-5140
Fax 504-608-1465


**Scott Silver** (will seek admission pro hac vice)
Silver Law Group
11780 W Sample Rd
Coral Springs, Florida 33065
ssilver@silverlaw.com
Phone 954-755-4799
Fax 954-755-4684


**Ryan Schawmm** (will seek admission pro hac vice)
Silver Law Group
11780 W Sample Rd
Coral Springs, Florida 33065
rschwamm@silverlaw.com
Phone 954-755-4799
Fax 954-755-4684


**CLASS ACTION COMPLAINT** – Page 53 of 54

**Peter M. Spett** (will seek admission pro hac vice)
Law Office of Peter M. Spett
3020 Windsor Circle
Boca Raton, Florida 33434
pspett@spettlaw.com
Phone 561-463-2799


**Kelly D. Jones, OSB No. 074217**
Law Office of Kelly D. Jones
819 SE Morrison Street Suite 255
Portland, Oregon 97214
kellydonovanjones@gmail.com
Phone 503-847-4329


**Daniel J Nichols, OSB No. 101304**
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, Oregon 97035
dan@jurislawyer.com
Phone 503-334-0611


**Emily Templeton, OSB No. 221744**
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
emily@underdoglawyer.com
Direct 971-352-2503


**Nate Haberman, OSB No. 225456**
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
nate@underdoglawyer.com
Phone 503-222-2000


**CLASS ACTION COMPLAINT** – Page 54 of 54