# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **AMIT FATNANI**, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-712-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **JPMORGAN CHASE BANK, N.A.; EVOLVE BANK AND TRUST; INTERTRUST GROUP BV; PNC BANK, N.A.; COLUMBIA BANKING SYSTEM, INC.,** as successor to Umpqua Holdings Corporation; **MERCURY TECHNOLOGIES INC.; INTERTRUST CORPORATE AND FUND SERVICES, LLC;** and **KEYBANK NATIONAL ASSOCIATION**, | |
| Defendants.[1] | |

---

[1] Plaintiff incorrectly named JPMorgan Chase Bank, N.A. as "JPMorgan Chase & Co." Without objection, the Court directed the clerk to make this change. In addition, Plaintiff's Second Amended Complaint named as a defendant The PNC Financial Services Group, Inc. ("PNCFSG"). Counsel for PNCFSG has explained that the correct entity to name as a defendant in this case is a wholly owned subsidiary of PNCFSG, PNC Bank, N.A. ("PNC Bank"). Without objection, the Court directed the clerk to substitute PNC Bank, N.A. for PNCFSG.

Daniel B. Centner, Grace Arden Van Hancock, and Jason J. Kane, PEIFFER WOLF CARR KANE CONWAY & WISE LLP, 935 Gravier Street, Suite 1600, New Orleans, LA 70112; Michael R. Fuller, Emily Templeton, and Nate Haberman, OLSENDAINES, US Bancorp Tower, 111 SW 5th Ave., Suite 3150, Portland, OR 97204; Kelly D. Jones, LAW OFFICE OF KELLY D. JONES, 819 SE Morrison Street, Suite 255, Portland, OR 97214; Daniel J. Nichols, JURISLAW LLP, Three Centerpointe Drive, Suite 160, Lake Oswego, OR 97035; Scott Silver and Ryan Schwamm, SILVER LAW GROUP, 11780 West Sample Road, Coral Springs, FL, 33065; and Peter M. Spett, LAW OFFICE OF PETER M. SPETT, 3020 Windsor Circle, Boca Raton, FL 33434. Of Attorneys for Plaintiff.

Nikki E. Dobay, GREENBERG TRAURIG, LLP, 10260 SW Greenburg Road, Suite 400, Portland, OR 97223; Paul J. Ferak, Jonathan H. Claydon, and Layal Bishara, GREENBERG TRAURIG, LLP, 77 West Wacker Drive, Suite 3100, Chicago, IL 60601. Of Attorneys for Defendant JPMorgan Chase Bank, N.A.

Keith A. Ketterling, Timothy S. DeJong, Lydia Anderson-Dana, Kevin M. Flannery, and Madeleine C. Holmes, STOLL STOLL BERNE LOKTING & SHLACHTER, PC, 209 SW Oak Street, Suite 500, Portland, OR 97204. Of Attorneys for Defendant Columbia Banking System, Inc.

James T. McDermott, and Ciaran P.A. Connelly, MCDERMOTT WEAVER CONNELLY CLIFFORD LLP, 1000 SW Broadway, Suite 960, Portland, OR 97205; Robert D. Wick and Jeffrey L. Huberman, COVINGTON & BURLING LLP, 850 Tenth Street NW, Washington, DC 20001. Of Attorneys for Defendant Evolve Bank and Trust.

Philip S. Van Der Weele and Elizabeth H. White, K&L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97204. Of Attorneys for Defendant PNC Bank, N.A.

Brian J. Lamb, Anthony J. Rospert, and Rebecca M. Pronesti, THOMPSON HINE LLP, 3900 Key Center, 127 Public Square, Cleveland, OH 44114; and Joel A. Parker, SCHWABE, WILLIAMSON & WYATT, P.C., 1211 SW 5th Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Defendant KeyBank National Association.

Paul Llewellyn and Zachary Christian Flood, LEWIS & LLEWELLYN LLP, 601 Montgomery Street, Suite 2000, San Francisco, CA 94111; and Scott L. Mullins, MULLINS LAW OFFICE, LLC, 1000 SW Broadway St., Suite 2300, Portland, OR 97205. Of Attorneys for Defendant Mercury Technologies, Inc.

Tyson E. Hafen, DUANE MORRIS LLP, 100 North City Parkway, Suite 1560, Las Vegas, NV 89106; Michael J. Rinaldi and Nicholas A. DiMarco, DUANE MORRIS LLP, 30 South Seventeenth Street, Philadelphia, PA 19103; and Monté T. Squire, DUANE MORRIS LLP, 1201 North Market Street, Suite 501, Wilmington, DE 19801. Of Attorneys for Defendants Intertrust Group BV and Intertrust Corporate and Fund Services, LLC.

**Michael H. Simon, District Judge.**

Plaintiff Amit Fatnani commenced this putative class action against eight defendants, consisting of four banks, a related pair of non-banking entities, and two other defendants that have reached tentative settlements with the Plaintiff and putative class. The bank defendants consist of: (1) JPMorgan Chase Bank, N.A. ("JPMC"); (2) PNC Bank, N.A. ("PNC"); (3) Columbia Banking System, Inc. ("Columbia"), as successor to Umpqua Holdings Corporation ("Umpqua"); and (4) KeyBank National Association ("KeyBank") (collectively referred to as the "Bank Defendants"). The two related non-bank Defendants are: (5) Intertrust Group BV ("Intertrust Group"); and (6) Intertrust Corporate and Fund Services LLC ("Intertrust Corporate," and together with Intertrust Group, "Intertrust Defendants"). The final two defendants, with whom Plaintiff and the putative class have reached tentative settlements, are: (7) Evolve Bank and Trust ("Evolve"); and (8) Mercury Technologies Inc. ("Mercury").

In his Second Amended Class Action Complaint ("SAC"), Plaintiff asserts three claims under the Oregon Securities Law, Or. Rev. Stat. (ORS) § 59.005 *et seq.* (First, Second, and Third Claims), and an Oregon common-law claim of joint liability for tortious conduct (Fourth Claim). Plaintiff asserts each claim against all Defendants. Plaintiff's claims arise from alleged events related to a Ponzi (or Ponzi-like) cryptocurrency scheme organized by two individuals not named as defendants in this action.

Plaintiff alleges that those two individuals unlawfully and fraudulently sold securities to persons that include Plaintiff and the putative class members. Plaintiff alleges that he invested $350,000 in this scheme. Plaintiff further alleges that approximately 170 similarly situated persons invested a total of at least $44 million in the scheme. Against the entities sued in this action, Plaintiff alleges they participated and materially aided in the unlawful sales of these

securities and aided and abetted breaches of fiduciary duties owed to Plaintiff and putative class members.

Pending before the Court are three motions to dismiss and a motion to compel. The Bank Defendants filed a Joint Motion to Dismiss ("Joint Motion"), seeking dismissal of all claims for failure to state a claim under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. ECF 90. One of the Bank Defendants, PNC, separately moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). ECF 96. Similarly, the Intertrust Defendants filed a separate motion to dismiss all claims against them for lack of personal jurisdiction under Rule 12(b)(2), and for failure to state a claim under Rules 12(b)(6) and 9(b). ECF 91.[2] Plaintiff, PNC, and JPMC also filed supplemental briefing on whether Plaintiff has standing to bring claims against PNC and JPMC.[3] ECF 136, 139. Finally, Plaintiff filed a Motion to Compel against the Intertrust Defendants. ECF 129. For the reasons stated below, the Court grants PNC's motion to dismiss for lack of personal jurisdiction; grants the Intertrust Defendants' motion to dismiss for lack of personal jurisdiction; grants in part the Bank Defendants' Joint Motion; and denies Plaintiff's Motion to Compel.

---

[2] Both Evolve and Mercury also filed separate motions to dismiss for lack of personal jurisdiction. *See* ECF 92 (Mercury's motion); ECF 94 (Evolve's motion). In addition, both joined the Joint Motion filed by the Bank Defendants. ECF 90. As noted, however, both Evolve and Mercury have reached tentative settlements with Plaintiff and the putative class. Accordingly, the Court denies without prejudice and with leave to renew the motions filed by Evolve and Mercury.

[3] Plaintiff, PNC, and the Intertrust Defendants also briefed the issue of whether, if the Court lacks personal jurisdiction over PNC or the Intertrust Defendants, dismissal or transfer of this case is more appropriate. ECF 136, 138, 139. The Court will address this issue, if needed, in a later decision.

## BACKGROUND[4]

### A.  The Scheme

Plaintiff's claims arise from Defendants' alleged actions related to a Ponzi (or Ponzi-like) cryptocurrency scheme (the "Scheme") organized by two individuals not named as defendants in this action: Sam Ikkurty, a resident of Portland, Oregon, and his employee, Ravishankar Avadhanam.[5] ECF 82 (SAC) ¶¶ 5, 8, 10. The Scheme was based in and run out of Ikkurty's apartment in Portland. SAC ¶¶ 10,13.

The Scheme involved the unlawful sale of unregistered securities.[6] At the center of the Scheme were two "Funds," both of which operated as limited partnerships: Rose City Income Fund ("Rose City Income Fund I"), and Rose City Income Fund II, LP ("Rose City Income Fund II," and together with Rose City Income Fund I, the "Rose City Funds"). SAC ¶¶ 18, 21. Limited partnership agreements to invest in the Rose City Funds stated that the investors' money would be used to "invest, hold[,] and trade" digital and crypto currencies. SAC ¶ 21. In reality, however, Ikkurty would pool the investors' funds and then distribute most of those funds as "profits," "dividends," "distributions," or income to other investors in a manner akin to a Ponzi

---

[4] The Court summarizes Plaintiff's allegations as stated in the SAC. In evaluating whether the Court may exercise jurisdiction over the Intertrust Defendants and PNC, the Court sets forth below additional facts alleged in the SAC and shown by affidavits and other evidence.

[5] Plaintiff also refers to Avadhanam as Ikkurty's "business partner." SAC ¶ 5.

[6] Section 5 of the Securities Act of 1933 makes unlawful the offer or sale of unregistered securities in interstate commerce. 15 U.S.C. § 77e. Rule 506(b) to Regulation D of the Securities Act of 1933 provides an exception to the registration requirement when, among other things, an offering complies with Rule 502. *See* 17 C.F.R. § 230.506(b)(1). Rule 502, in turn, prohibits an issuer from offering or selling a security "by any form of general solicitation or general advertising." *Id.* § 230.502(c). According to Plaintiff, the securities were sold under a purported Rule 506(b) exemption from federal registration, but because Ikkurty and Avadhanam extensively marketed the Scheme, they were required to register the securities with Oregon's Department of Consumer and Business Services.

scheme. *Id.* The marketing materials and investment documents provided to investors stated that distributions would be paid out of profits generated through trading cryptocurrencies, cryptocurrency mining, or both. SAC ¶ 24. In reality, the Rose City Funds never generated any investment profit; the paid "distributions" simply were the return of investors' principal. SAC ¶¶ 24, 96.

The Commodity Futures Trading Commission ("CFTC"), the federal agency that regulates the U.S. derivatives market, among other markets, has alleged that the Scheme involved at least $44 million solicited from 170 investors. SAC ¶ 95. More than half of that $44 million was transferred to other investor-participants, and another $18 million was transferred to an offshore entity from which no funds were returned to any account for distribution to investors. SAC ¶¶ 6, 96. Ikkurty and Avadhanam operated the Scheme from as early as October 2017 up until May 2022, when the CFTC froze the Rose City Funds' assets. SAC ¶¶ 10, 71.

In furtherance of the Scheme, Ikkurty and Avadhanam operated a web of affiliated limited partnerships and limited liability corporations. These included a company owned by Ikkurty, Jafia LLC, which served as the general partner of the Rose City Funds. SAC ¶ 18. Ikkurty and Avadhanam also formed a second company, Seneca Ventures LLC ("Seneca Ventures"), which served as a conduit for smaller investors to invest in the Scheme. SAC ¶ 19. Seneca Ventures is a Wyoming company that, at times, used a mailbox address in Florida as its principal place of business, and at other times used the address of Ikkurty's residence. Seneca Ventures was used to pool investor funds and transfer them into the Rose City Funds. *Id.* Jafia LLC, Seneca Ventures, several other LLCs, and the Rose City Funds operated as a cohesive whole under Ikkurty's direction to carry out the Scheme. SAC ¶ 20. Ikkurty, Avadhanam, Jafia LLC, Seneca Ventures, and the Rose City Funds are collectively referred to as the "Jafia Group."

In 2022, the CFTC brought an action against Ikkurty and Avadhanam based on their alleged organization of a Ponzi scheme that defrauded 170 individuals through the unlawful and misleading sales of unregistered securities. SAC ¶ 5. Avadhanam admitted running a Ponzi scheme. SAC ¶ 6. In August 2023, he entered into a Consent Order with the CFTC admitting that:

> At all relevant times, [Ikkurty, Avadhanam, and Jafia LLC] pooled participant funds, and then, at Ikkurty's direction, distributed the majority of those funds as "profits," "dividends," "distributions," or income to other participants in a manner akin to a Ponzi scheme, or transferred funds to accounts controlled by and/or for the benefit of Ikkurty, Jafia, [the Rose City Funds,] and/or Seneca Ventures.
>
> . . . .
>
> Of the more than $44 million [Ikkurty, Avadhanam, and Jafia LLC] . . . accepted from participants after January 2021, they transferred more than half to other participants or entities owned and controlled by Ikkurty . . . . Ikkurty and Jafia also transferred approximately $18 million to an off-shore entity, and never returned any profits, earnings or funds of any kind from the entity to any Rose City or Seneca account for distribution to participants.

*Id.*[7] Similarly, Ikkurty has admitted that the Rose City Funds operated in a Ponzi-like fashion by using investor capital to pay distributions to other investors. SAC ¶ 98. The CFTC has characterized Ikkurty as the mastermind of the Scheme. SAC ¶ 7.[8]

---

[7] The Court takes judicial notice of the contents of the Consent Order filed in the civil action against Ikkurty and Avadhanam.

[8] On July 1, 2024, the U.S. District Court for the Northern District of Illinois granted summary judgment in favor of the CFTC and against Ikkurty for multiple violations of the Commodity Exchange Act. *Commodity Futures Trading Comm'n v. Ikkurty*, 2024 WL 3251348 (N.D. Ill. July 1, 2024).

**B. Defendants' Alleged Involvement with the Scheme**

**1. Bank Defendants**

From August 2020 through June 2021, Ikkurty and Avadhanam established relationships with and opened a series of accounts with several banks, including with the Bank Defendants. These accounts were used to hold and move funds that were received from investors as part of the Scheme, and some of those accounts were used to pay purported distributions and interest payments to investors. SAC ¶ 25. The Court describes separately the alleged involvement of each Bank Defendant.

**a. Umpqua[9]**

In August 2020, Ikkurty opened a series of Umpqua accounts in the names of Jafia LLC, Ikkurty Capital, and MySivana LLC, as well as his own name (collectively, the "Umpqua Accounts"). SAC ¶ 31. Approximately $24 million in funds invested in the Rose City Funds ultimately landed in the Umpqua Accounts and was moved freely by Ikkurty among those accounts. SAC ¶ 32. The Umpqua Accounts also were used to issue pre-drawn "distribution" checks that simply returned investors' principal. SAC ¶ 33. These checks listed Jafia LLC as the payor, with a Florida address for an "apartment" that is, in fact, a PO Box operated out of a UPS store. *Id.*

**b. KeyBank**

Beginning in December 2020, Ikkurty opened a series of accounts at KeyBank under the name of Rose City Income Fund II and opened additional accounts in his own name and the name of Seneca Ventures. SAC ¶ 34. Ikkurty opened these accounts using his Portland address, and statements were sent to that address. SAC ¶ 35. Investors who executed subscription

---

[9] As stated, Plaintiff sues Columbia as successor to Umpqua.

agreements or promissory notes to invest in the Funds were directed to issue their payments to one of the Rose City Income Fund II accounts at KeyBank. SAC ¶ 36. The memos on these payments reflected that the payments were made for the purpose of investing in the Rose City Funds. *Id.* According to Plaintiff, KeyBank wired the purported "distributions" to investors, and also wired investors' funds into other accounts that Ikkurty controlled for his own benefit, including accounts in his personal name. SAC ¶ 37.

### c.    PNC

In April 2021, Avadhanam opened a PNC bank account under the name of Seneca Ventures. SAC ¶ 39. The account was used as a "feeder account" that received small deposits from investors, which those investors often labeled as "investments" or designated for "Rose City." *Id.* After the funds were deposited, they were pooled and transferred to a different bank that was used to complete the individual investors' purported "investment" transactions. *Id.* Ikkurty has admitted that the only source of funds for this PNC account was investor funds provided as deposits for investments in the Rose City Funds. SAC ¶ 40. PNC closed the account in June 2021, possibly due to suspicious activity.[10] SAC ¶ 43, 128.

### d.    JPMC

In June 2021, Ikkurty and Avadhanam opened JPMC accounts under Ikkurty's name and under the "Seneca Ventures" and "Jafia LLC" names. SAC ¶ 44. For at least one account, the opening documents falsely described Ikkurty's business as a "technology consulting firm in

---

[10] Plaintiff alleges that "[t]wo or more" of the Bank Defendants closed Jafia Group accounts "in light of suspicious activities," and states that one of those accounts was a JPMC account. *See* SAC ¶¶ 48, 128. Although Plaintiff does not expressly allege that the PNC account was the second account closed due to suspicious activity, it is the only other account that Plaintiff alleges was closed.

software programming"; Ikkurty, however, did not conduct any such business.[11] *Id.* One of the accounts[12] was used in the same manner as the PNC account described above: the account was used as a "feeder account" that received small deposits from investors, which those investors often labeled as "investments" or designated for "Rose City." SAC ¶ 45. The funds in that account were pooled and transferred to a different bank that was used to complete the individual investors' purported "investment" transactions. *Id.*

Plaintiff alleges that during a seven-month span, more than $10 million of investor deposits flowed through this JPMC account. SAC ¶ 46. Of those funds, over 90 percent were transferred to "Rose City Income Fund II" accounts held by other banks, with the remaining funds transferred to a "Seneca Ventures" account that was used to pay the purported "distributions." *Id.* Plaintiff alleges that JPMC closed the Seneca Ventures account due to suspicious activity. SAC ¶ 48.

### e. Additional Allegations

Plaintiff alleges that all Defendants have "robust diligence processes overseen by sophisticated compliance departments." SAC ¶ 66. Plaintiff also points to regulations that require the Bank Defendants to know their customers, monitor accounts for suspicious activity, and maintain internal control systems to prevent banking services from being misused to carry out illegal activity, including financial fraud and money laundering; Plaintiff details how banks implement those requirements through internal processes and training. SAC ¶¶ 100, 101-05, 107-17. Plaintiff also alleges that guidance from the Federal Financial Institutions Examination

---

[11] It is unclear from the SAC whether these opening documents related to a single JPMC account or multiple JPMC accounts. *See* SAC ¶¶ 44-45.

[12] Plaintiff does not specify which account.

Council instructs banks on which specific activities by their customers indicate financial misconduct; these include suspicious fund transfer activities. SAC ¶ 106. Plaintiff alleges that in implementing these processes, requirements, and guidance, all Defendants "learned facts showing that the Rose City Funds were soliciting the sale of unregistered securities," and "[knew] of a seemingly never-ending stream of illicit transfers of funds between a web of affiliates all controlled by the same individual." SAC ¶ 66.

### 2. Intertrust Defendants

According to Plaintiff, "InterTrust"[13] served as administrator of the Rose City Funds. SAC ¶ 56. Among other things, Plaintiff alleges that the Intertrust Defendants processed initial investment transactions; handled distributions and redemptions; prepared account summary documents and statements; and assisted with regulatory compliance. *Id.* Plaintiff alleges that "InterTrust" allowed Ikkurty to use the "InterTrust" name, which was well-known, and that Ikkurty did so in his marketing efforts associated with the Scheme. SAC ¶ 60. Plaintiff alleges that after Intertrust Group negotiated the engagement with Ikkurty, its subsidiary, Intertrust Corporate, handled day-to-day administrative tasks, working directly with Ikkurty. SAC ¶ 61.

The Rose City Subscription Agreement directed investors who wished to invest in the Rose City Funds to:

> send completed and executed copies of the documents . . . and all attachments and any required supporting documentation to InterTrust Group, Attn: Michael Secondo, by e-mail to Michael.Secondo@intertrustgroup.com, no later than one (1) Business Day before JAFIA LLC (the "General Partner") elects to accept this capital contribution (the "Admission Date").

---

[13] The SAC often refers to "InterTrust" generally, such that it is unclear whether Plaintiff's allegations involve Intertrust Group, Intertrust Corporate, or both. The Intertrust Defendants point out that Plaintiff incorrectly capitalizes the "T" in "Intertrust."

SAC ¶ 62. Intertrust Corporate would verify subscription documents and ensure that the investor had wired funds needed to complete the sales transaction. *Id.*

Plaintiff alleges that "InterTrust," in keeping with its duties as administrator, had access to and knowledge of financial statements and records from Rose City Funds. SAC ¶ 63. According to Plaintiff, those statements and records showed that investment capital was pooled and used to pay the purported "distributions," as opposed to distributions properly paid out of investment returns. *Id.* Plaintiff further alleges that because "InterTrust" calculated net asset values for Rose City Income Fund II, it knew that the fund was not generating any revenue through trading and was instead simply paying "distributions" and fees out of investor capital. SAC ¶ 64.

### C.  Plaintiff's Investments

In early 2021, Plaintiff received solicitations and offering materials created by Ikkurty, after which Plaintiff made two investments. SAC ¶ 82, 83, 89. On about March 1, 2021, Plaintiff invested $100,000 through a subscription agreement in Rose City Income Fund II. SAC ¶ 83. The subscription agreement provided that the investment was not complete until the prospective investor completed certain steps, including issuing payment by wiring money to a KeyBank account and sending executed subscription agreements, limited partnership agreements, and a W-9 to Intertrust. SAC ¶ 84.

Consistent with these instructions, Plaintiff wired funds to the KeyBank account that Ikkurty had opened in the name of Rose City Income Fund II and sent "InterTrust" the required information. SAC ¶ 85. On March 31, 2021, after confirming receipt of the funds, "InterTrust" sent a confirmation of investment to Plaintiff that confirmed his subscription for $100,000 and which was signed by Intertrust Corporate as "Registrar and Transfer Agent of Rose City Income Fund II LP." SAC ¶ 86. "InterTrust" then sent Plaintiff scheduled monthly "distributions" for his

investment. SAC ¶ 88. According to Plaintiff, those purported "distributions" comprised commingled funds that had flowed, at various points, through accounts held with KeyBank, PNC, JPMC, Evolve, and Umpqua. *Id.*

On about March 17, 2021, Plaintiff purchased, for $250,000, a promissory note (Promissory Note) issued by Rose City Income Fund II's general partner, Jafia LLC. SAC ¶ 89. Under the terms of the Promissory Note, Plaintiff was to receive scheduled monthly payments in the form of predated, sequentially numbered checks drawn on Jafia LLC's Umpqua account. SAC ¶ 90. Ikkurty gave Plaintiff 24 checks labelled "Interest Payment," which Plaintiff was to deposit monthly beginning in April 2021. SAC ¶ 91. The $250,000 was deposited into an Umpqua account, where those funds were used to pay monthly "distributions" to Plaintiff and others. SAC ¶ 89.

Plaintiff received the scheduled "distributions" and interest payments until May 2022, when Plaintiff's personal bank notified him that his monthly interest payment check had not cleared. SAC ¶ 93. Later that month, the CFTC obtained an emergency order freezing all assets of Ikkurty and the Rose City Funds. SAC ¶ 94.

## DISCUSSION

### A.  Motion to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2)

Plaintiff asserts general and specific personal jurisdiction over Columbia and asserts specific personal jurisdiction over all other Defendants. The Intertrust Defendants and PNC move to dismiss all claims for lack of personal jurisdiction under Rule 12(b)(2).

#### 1.  Standards

In a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of proving that the court's exercise of jurisdiction is proper. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th

Cir. 2004). Although a plaintiff may not rest solely on the "bare allegations of its complaint,

uncontroverted allegations in the complaint must be taken as true." *Id*. In addition, conflicts

between the parties over statements in affidavits must be resolved in the plaintiff's favor. *Id.*

Unless a federal statute governs personal jurisdiction, a district court applies the law of

the forum state. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Oregon's long-arm

statute is co-extensive with constitutional standards. *Gray & Co. v. Firstenberg Mach. Co.*, 913

F.2d 758, 760 (9th Cir. 1990) (citing Or. R. Civ. P. 4L; *Oregon ex rel. Hydraulic Servocontrols

Corp. v. Dale*, 294 Or. 381, 384 (1982). Thus, this Court need only determine whether its

exercise of personal jurisdiction over any Defendant would offend constitutional due process

requirements. *See Boschetto*, 539 F.3d at 1015; *Hydraulic Servocontrols*, 294 Or. at 384.

Due process requires that the defendant "have certain minimum contacts with [the forum]

such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation marks

omitted). The Supreme Court has rejected the application of "mechanical" tests to determine

personal jurisdiction. *Id*. at 319; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).

Rather, a court should consider the "quality and nature of the activity in relation to the fair and

orderly administration of the laws which it was the purpose of the due process clause to insure."

*Int'l Shoe*, 326 U.S. at 319.

"There are two forms of personal jurisdiction that a forum state may exercise over a

nonresident defendant—general jurisdiction and specific jurisdiction." *Boschetto*, 539 F.3d

at 1016. A court has general personal jurisdiction over a defendant whose contacts with the

forum are "continuous and systematic" even if those contacts are wholly unrelated to the

plaintiff's claims. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16

(1984). If the court lacks general personal jurisdiction, it may have specific personal jurisdiction

if the defendant has certain minimum contacts with the forum state, the controversy arose out of

those contacts, and the exercise of jurisdiction is reasonable. *See Burger King*, 471 U.S.

at 472-74, 477.

The "essential foundation" of specific jurisdiction is a "strong relationship among the

defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist.*, 141 S. Ct.

1017, 1021 (2021) (quotation marks omitted). "[T]he relationship must arise out of contacts that

the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014)

(quoting *Burger King*, 471 U.S. at 475) (emphasis in *Burger King*). The analysis also must look

to the defendant's contacts with the forum state, and not with persons who reside there. *Id.* at

285. A defendant may be "haled into court in a forum State based on his own affiliation with the

State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with

other persons affiliated with the State." *Id.* at 286 (quoting *Burger King*, 471 U.S. at 475).

Ultimately, "the defendant's suit-related conduct must create a *substantial* connection with the

forum State." *Id.* at 284 (emphasis added); *see also id.* at 290 ("The proper question is . . .

whether the defendant's conduct connects him to the forum in a meaningful way.").

To determine whether the exercise of specific personal jurisdiction over a nonresident

defendant is appropriate, the Ninth Circuit applies a three-part test, commonly referred to as the

"minimum contacts" test:

> (1)    The non-resident defendant must purposefully direct his
> activities or consummate some transaction with the forum or
> resident thereof; or perform some act by which he purposefully
> avails himself of the privilege of conducting activities in the
> forum, thereby invoking the benefits and protections of its laws;
>
> (2)    the claim must be one which arises out of or relates to the
> defendant's forum-related activities; and

>    (3)    the exercise of jurisdiction must comport with fair play and
>    substantial justice, *i.e.* it must be reasonable.

*Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 603 (9th Cir. 2018) (quoting

*Schwarzenegger*, 374 F.3d at 802). The plaintiff bears the burden of satisfying the first two

prongs. *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011). If a

plaintiff does so, the burden of satisfying the third prong then shifts to the defendant to present a

"'compelling case' that the exercise of jurisdiction would not be reasonable." *Boschetto*, 539

F.3d at 1016 (quoting *Schwarzenegger*, 374 F.3d at 802).

The first prong embodies two distinct, although sometimes conflated, concepts:

purposeful availment and purposeful direction. *See Brayton Purcell LLP v. Recordon &

Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010), *abrogated on other grounds as recognized in

Axiom Foods*, 874 F.3d 1064, 1169-70 (9th Cir. 2017). For tortious conduct that takes place

within the forum state, the purposeful availment test is generally appropriate, while the

purposeful direction analysis is generally appropriate for tortious conduct that takes place outside

the forum state but has an effect within the forum state. *See Freestream Aircraft*, 905 F.3d

at 604-06. The Ninth Circuit, however, has emphasized that there is no "rigid dividing line

between these two types of claims." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154,

1162 (9th Cir. 2023) (quotation marks omitted). "Rather, when considering specific jurisdiction,

courts should comprehensively evaluate the extent of the defendant's contacts with the forum

state and those contacts' relationship to the plaintiffs' claims—which may mean looking at both

purposeful availment and purposeful direction." *Id.*

Personal jurisdiction "depends only upon *each* defendant's relationship with the forum."

*Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990) (emphasis added). Accordingly,

"[p]ersonal jurisdiction over each defendant must be analyzed separately." *Harris Rutsky & Co.*

*Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003). In addition, a plaintiff must satisfy its burden as to personal jurisdiction for each claim asserted. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).

### a. Purposeful Direction

Under the test for purposeful direction, often called the "effects test,"[14] "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (cleaned up). Under the first prong of the effects test, a plaintiff must demonstrate that the defendant committed an "intentional act," *i.e.*, "an external manifestation of the actor's intent to perform an actual, physical act in the real world." *Wash. Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 674 (9th Cir. 2012), *abrogated on other grounds by Axiom Foods*, 874 F.3d at 1069-70.

Under the second prong of the effects test, a plaintiff must demonstrate that the defendant expressly aimed its actions at the forum state. The Ninth Circuit has "emphasized that 'something more' than mere foreseeability [is required] in order to justify the assertion of personal jurisdiction, and that 'something more' means conduct expressly aimed at the forum." *Brayton Purcell*, 606 F.3d at 1129 (alteration in original) (citation omitted). "[T]he express aiming requirement . . . requires contacts created by the defendant directly with the forum state, and not merely with a forum-state resident." *Control Sols., Inc. v. MicroDAQ.com, Inc.*, 126 F.

---

[14] The "effects test" derives from *Calder v. Jones*, 465 U.S. 783 (1984). *See Doe v. WebGroup Czech, a.s.*, 93 F.4th 442, 452 (9th Cir. 2024).

Supp. 3d 1182, 1191 (D. Or. 2015) (citing *Walden*, 571 U.S. at 284-85; and *Picot*, 780 F.3d at 1214).

Under the third prong of the effects test a plaintiff must demonstrate that the defendant's "conduct caused harm that it knew was likely to be suffered in the forum." *Brayton Purcell*, 606 F.3d at 1131. "This element is satisfied when [the] defendant's intentional act has foreseeable effects in the forum." *Id.* (quotation marks omitted) "The 'brunt' of the harm need not be suffered in the forum state," and this element may be established even if "the bulk of the harm" occurs outside the forum. *Yahoo! Inc.*, 433 F.3d at 1207 (some quotation marks omitted).

### b. Purposeful Availment

In contrast to purposeful direction, purposeful availment requires a court to look at a defendant's "entire course of dealing with the forum state—not solely the particular contract or tortious conduct giving rise to a plaintiff's claim." *Davis*, 71 F.4th at 1163 (cleaned up). Purposeful availment "exists when a defendant's dealings with a state establish[] a 'quid pro quo'—where the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,' and in return 'submits to the burdens of litigation' in the State." *Id.* (quoting *Schwarzenegger*, 374 F.3d at 802) (cleaned up). For a defendant to be subject to jurisdiction based on "purposeful availment," the defendant "must have deliberately reached out beyond its home" to the forum state—for example, by "exploiting a market in the forum State or entering a contractual relationship centered there." *Id.* (cleaned up). "[B]usiness activity constitutes purposeful availment when that activity reaches out and creates '*continuing relationships and obligations*' in the forum state." *Silk v. Bond*, 65 F.4th 445, 457 (9th Cir. 2023) (quoting *Boschetto*, 539 F.3d at 1017) (emphasis in *Boschetto*).

### 2. Analysis

In evaluating whether the Court may exercise personal jurisdiction over the Intertrust Defendants and PNC, the Court first determines the relevant jurisdictional facts and then proceeds to the jurisdictional analysis.

### a. Intertrust Defendants

### i. Jurisdictional Facts

### (A) Plaintiff's Allegations

Plaintiff asserts that the following facts are relevant to whether this Court may exercise jurisdiction over either or both Intertrust Defendants:[15]

- "High-level executives" from Intertrust Group, including its CEO and internal compliance and risk manager, engaged in "extensive rounds of negotiations" with Ikkurty while he was in Oregon, including—"upon information and belief"—an in-person meeting with Ikkurty in Portland. SAC ¶ 56; ECF 31 at 86.

- Intertrust Corporate entered into an agreement with Jafia, LLC (the general partner of the Rose City Funds) that identified Ikkurty as the owner and "sole officer, president, registered agent[,] and authorized person" for Jafia LLC, and under which Intertrust

---

[15] As noted, the SAC often refers to "InterTrust" generally, such that it is unclear whether Plaintiff's allegations involve Intertrust Group, Intertrust Corporate, or both. Courts have consistently found such lumping together of defendants to violate the requirements of Rule 8 of the Federal Rules of Civil Procedure. *See Karkanen v. California*, 2018 WL 3820916 at * 7 (N.D. Cal. Aug. 10, 2018) (collecting cases)); *see also Seldin v. HSN, Inc.*, 2018 WL 3570308, at *8-9 (S.D. Cal. July 25, 2018) (explaining that Ninth Circuit law "is clear that allegations of jurisdiction over each defendant must be established individually," and therefore that "grouping of [defendants] together to establish personal jurisdiction, general or specific, is inadequate" (quoting *Sher*, 911 F.2d at 1365)). However, to the extent that Plaintiff's allegations are sufficiently clarified in his omnibus opposition to Defendant's Rule 12(b)(6) motions or were sufficiently clarified during oral argument, the Court considers those allegations in evaluating whether it may exercise personal jurisdiction over each Intertrust entity. *See Vermillion v. Corr. Corp. of Am.*, 2009 WL 939721 ("A plaintiff's opposition may always be used 'to clarify allegations in her complaint whose meaning is unclear.'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000))). At the same time, to the extent that Plaintiff has failed to clarify which allegations relate to which Intertrust entity and which Intertrust entity Plaintiff intends to reference in his arguments, the Court does not consider those allegations or arguments.

Corporate would perform administrative services for the Rose City Funds. *See* SAC ¶ 62; ECF 107 at 32.[16]

- Intertrust Corporate served as the "funds administrator" for the Rose City Funds, and was therefore responsible for, among other things, processing investment transactions, handling distributions, redemptions, and preparing account summary documents and statements. SAC ¶ 56.

- Intertrust Corporate calculated net asset values for Rose City Income Fund II and sent those values to Ikkurty in Portland before working with him to calculate his fees. SAC ¶ 64.

- Ikkurty solicited investments in the Scheme by, among other things, circulating from his Portland apartment, and to potential investors, a "pitch deck" that identified "InterTrust" as the "Fund Administrator," and required executed documents to be sent to an individual represented as an employee of Intertrust Group. SAC ¶¶ 60, 62.[17]

### (B) Intertrust's Factual Assertions

In support of its motion to dismiss, the Intertrust Defendants assert the following facts:

- No one from Intertrust Group, Intertrust Corporate, or any of their respective affiliates traveled to Oregon to conduct negotiations over the Administrative Services Agreement between Intertrust Corporate and Jafia LLC. ECF 117 at 10-11.

---

[16] In support of his assertion that the agreement identified Ikkurty as the owner and "sole officer, president, registered agent[,] and authorized person" for Jafia LLC, Plaintiff cites the CFTC's Complaint in the civil action brought against Ikkurty and Avadhanam. The Administrative Services Agreement between Ikkurty and Jafia LLC, which the Intertrust Defendants provide in support of their motion to dismiss, describes Ikkurty as the "sole investment manager" for Jafia LLC, but does not appear to include the quoted language. *See* ECF 118-1 at 14. These differences, however, do not appear to be material.

[17] In addition to these specific allegations, Plaintiff also generally alleges that "[t]his Court has specific personal jurisdiction over [all Defendants other than Umpqua] because they knowingly entered into business relationships with residents of [Oregon] in furtherance of an illicit scheme operated out of Portland, Oregon." SAC ¶ 30. Such general, conclusory allegations are insufficient to establish personal jurisdiction. *See, e.g.*, *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007) (finding conclusory allegations of contact between defendants and forum state insufficient to establish a prima facie showing of personal jurisdiction); *see also Seldin*, 2018 WL 3570308, at *8-9 (explaining that Ninth Circuit law "is clear that allegations of jurisdiction over each defendant must be established individually" (quoting *Sher*, 911 F.2d at 1365)).

- Intertrust Group (which is incorporated and headquartered in the Kingdom of the Netherlands), has no contacts with Oregon (*e.g.*, no office or facility, no employees, representatives, or agents, no bank accounts or other assets). *Id.* at 7.

- The engagement between Intertrust Corporate and Jafia LLC was negotiated by remote means, led by a New York-based employee of Intertrust Corporate Services Delaware Ltd. (an affiliate of Intertrust Corporate). *Id.*

- The Administrative Services Agreement is governed by New York Law and has a New York forum-selection clause. *Id.*

- The administrative work for Rose City Income Fund II was performed exclusively out of the Republic of India by personnel at an Intertrust Corporate affiliate. *Id.* at 8.

- While administering Rose City Income Fund II, Intertrust Corporate processed investor documents and prepared and disseminated monthly statements to investors, none of whom was based in Oregon (including Plaintiff, a California resident). *Id.*

The Intertrust Defendants support each of those assertions with evidence. Plaintiff provides no contrary evidence. Accordingly, the Court credits the above assertions, and, to the extent that those assertions contradict Plaintiff's unsupported allegations, those allegations cannot establish personal jurisdiction over the Intertrust Defendants. *See AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020) ("Although uncontroverted allegations in the complaint must be taken as true and conflicts between parties over statements contained in affidavits must be resolved in [the plaintiff's] favor, disputed allegations in the complaint that are not supported with evidence or affidavits cannot establish jurisdiction." (cleaned up)).

### ii. Application

### (A) Intertrust Group

As to Intertrust Group, Plaintiff cannot satisfy either the test for purposeful direction or the test for purposeful availment, and therefore cannot satisfy the first prong of the minimum contacts test for specific personal jurisdiction. Plaintiff has not shown any intentional act by

Intertrust Group that was expressly aimed at Oregon.[18] Nor has Plaintiff shown an "entire course of dealing" with Oregon through which Intertrust Group "purposefully avail[ed] itself of the privilege of conducting activities within [Oregon], thus invoking the benefits and protections of its laws." *See Davis*, 71 F.4th at 1163 (quotation marks omitted).[19] Accordingly, the Court dismisses Plaintiff's claims against Intertrust Group, for lack of personal jurisdiction under Rule 12(b)(2).

### (B)  Intertrust Corporate

Plaintiff also has not satisfied his burden to establish this Court's jurisdiction over Intertrust Corporate under the test for purposeful availment or the test for purposeful direction.

---

[18] Plaintiff alleges that "InterTrust" allowed the "InterTrust" name and logo to be used in connection with Ikkurty's marketing efforts, but Plaintiff does not specify which Intertrust entity's name or logo Ikkurty used or which entity permitted use of the name and logo. Even if Ikkurty used Intertrust Group's name and logo and did so with Intertrust Group's permission, that would not be enough to show sufficient "contacts created by [Intertrust Group] directly with [Oregon], and not merely with a forum-state resident," as required under the second prong of the effects test for purposeful direction. *See Control Sols.*, 126 F. Supp. 3d at 1191. Nor would permission to use the logo be sufficient to show that that Intertrust Group purposefully availed itself of the privilege of conducting activities within Oregon.

[19] Plaintiff asserts that Intertrust Corporate "acted as a general agent for Intertrust Group in connection with the engagement, and, as such, [Intertrust Corporate's] forum contacts should be imputed to Intertrust Group." ECF 107 at 32. The Ninth Circuit has not directly considered whether the acts of one entity can be imputed to another for the purposes of specific jurisdiction. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2017) (noting that "an agency theory of imputable contacts" in the context of specific jurisdiction conflicts with the Supreme Court's directive in *Walden* "that contacts must be directly between the defendant and the forum," and noting that several district courts within the Ninth Circuit have cast doubt on whether a theory of imputable contacts could apply in the context of specific jurisdiction). Even assuming, however, that an agency theory applies in the context of specific jurisdiction, and even had Plaintiff established that Intertrust *Corporate* is subject to jurisdiction in Oregon (which, for the reasons stated below, Plaintiff has not), Plaintiff's conclusory allegations would be insufficient to show an agent-principal relationship between Intertrust Group and Intertrust Corporate under the applicable standard. *See id.* at 1024-25(explaining that, even assuming that "some standard of agency continues to be relevant to the existence of specific jurisdiction," a plaintiff seeking to establish jurisdiction would need to demonstrate that the purported principal "had the right to control [the purported agent's] activities." (cleaned up; emphasis omitted)).

As for purposeful availment, Plaintiff points to the negotiations underlying the contract between Intertrust Corporate and Jafia LLC; Intertrust Corporate's obligations under the Administrative Services Agreement; and the resulting "promot[ion of] the transaction of business within Oregon." ECF 107 at 34. For the reasons explained below, however, those activities and obligations are insufficient to show that Intertrust Corporate "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *See Davis*, 71 F.4th at 1163 (cleaned up).

In considering purposeful availment, the Court finds instructive the Ninth Circuit's analysis in *Davis* of a contractual relationship between a resident third party and a nonresident defendant. In *Davis*, the court looked to the negotiations underlying the parties' contract, the contracts terms, the contemplated consequences of the contract, and the parties' actual course of dealing, and found that the plaintiffs failed to establish that the defendant personally availed itself of the benefits and protections of the forum state. *Id.* at 1163-66. That analysis requires the same conclusion here. As for contract negotiations, the court in *Davis* noted that there was no evidence that the defendant sought out the third party in the forum state or benefited from the third party's residence there. *Id.* at 1163. So too here: Plaintiff has not alleged that Intertrust Corporate sought out business with Ikkurty or Jafia LLC in Oregon or shown that Intertrust Corporate benefited from Ikkurty's, Jafia LLC's, or the Rose City Funds' relationship with Oregon.

As for contract terms, the *Davis* court noted that "none of the contract terms invoke the laws of Idaho." *Id.* at 1164. That also is the case here: the Administrative Services Agreement between Jafia LLC and Intertrust Corporate, which is governed by New York law and has a New

York forum selection clause, nowhere mentions Oregon.[20] ECF 118-1 at 10. As for "contemplated consequences," the *Davis* court noted that even though the contract contemplated the defendant's assistance to the forum resident, "[n]othing in the contract's contemplated consequences suggests that [the defendant] sought to benefit from [the forum state's] laws." 71 F.4th at 1164. That is also so here: Intertrust Corporate contracted with Jafia LLC to provide administrative services for the Rose City Funds, but nothing in the Administrative Services Agreement evinces Intertrust Corporate's attempt to benefit from Oregon's laws.

Finally, as for "actual course of dealings," the *Davis* court found "a somewhat closer question." *Id.* at 1164. The court noted that "remote work" on behalf of the forum entity could not, standing alone, establish purposeful availment. *Id.* at 1165. In fulfilling the contract terms, however, the defendant's employees had "engaged in several telephone calls, emails, and other correspondence" with individuals in the forum, and made two trips to the forum state "as part of the contract." *Id.* at 1164-65. The Court found these contacts, even when considered together, insufficient to establish a substantial connection to the forum, noting that "the bulk of [the defendant's] work under the contract took place [in the United Kingdom]." *Id.* at 1165-66. Here, the Intertrust Defendants have presented evidence not only showing that the engagement between Intertrust Corporate and Jafia LLC was negotiated by remote means, but also that the fund administration services were performed in the Republic of India. The Intertrust Defendants have also presented evidence showing that none of the investors in Rose City Income Fund II—and, by extension, that none of the investors to which Intertrust Corporate sent statements—was

---

[20] Although Plaintiff alleges that Jafia LLC was headquartered in Portland, the Administrative Services Agreement describes Jafia LLC as a company "incorporated under the Laws of Florida with its place of business" at a Florida address. As for the Rose City Funds, the Administrative Services Agreement refers only to the state of incorporation for both Rose City Funds (Delaware). ECF 118-1 at 2.

from Oregon.[21] *See* ECF 117 at 21. In sum, under *Davis*, Plaintiff has failed to show jurisdiction over Intertrust Corporate based on purposeful availment.

The Court finds unpersuasive Plaintiff's alternative argument regarding Intertrust Corporate's promotion of business in Oregon. Plaintiff argues that Intertrust Corporate's actions under the Administrative Services Agreement satisfy the test for purposeful availment because, according to Plaintiff, those actions "promoted the transaction of business within Oregon"—namely, "the sale of investments marketed from Oregon." ECF 107 at 34. In support of his argument, Plaintiff cites this Court's decision in *Helicopter Transport Services LLC v. Sikorsky Aircraft Corp.*, 253 F. Supp. 3d 1115 (D. Or. 2017). In *Helicopter Transport*, however, the "promot[ion] . . . of business within the forum state" involved the defendant's extensive targeting of Oregon businesses to promote the object of *the defendant's* business—namely, "the sale of replacement parts and related services and technical advice." *Id.* at 1129; *see also id.* ("[The defendant] has a longstanding business relationship with many businesses in Oregon, contacts [the plaintiff] and other businesses in Oregon, and sends parts, information, advice, and advertisements to Oregon . . . . Further, Oregon has several heavy-lift helicopter companies, and [the defendant] targets those companies in this forum to do business."). In contrast, in this case, Plaintiff primarily emphasizes the activities of Intertrust Corporate that promoted *Ikkurty's* business—the "sale of investments marketed from Oregon." ECF 107 at 34. Thus, even assuming that Ikkurty's business involved *sales in* Oregon (not just "*marketing from*" Oregon),

---

[21] The Administrative Services Agreement refers to both Rose City Income Fund I and Rose City Income Fund II. Whether Intertrust Corporate provided administrative services for Rose City Income Fund I in addition to Rose City Income Fund II is unclear, but Plaintiff alleges that he invested only in Rose City Income Fund II, *see* SAC ¶ 83, and it appears undisputed that for the purposes of personal jurisdiction over the Intertrust Defendants, that is the only relevant fund.

*Helicopter Transport* does not meaningfully support the Court's exercise of personal jurisdiction in this case.[22]

As for purposeful direction, Plaintiff has failed to show cognizable harm in Oregon, and therefore fails under the third prong of the effects test. It is undisputed that Plaintiff is a resident of California, and uncontested evidence provided by the Intertrust Defendants shows that no investor in Rose City Income Fund II was from Oregon and that Intertrust Corporate did not send any investor statements to Oregon.[23] *See* ECF 117 at 21.

Plaintiff concedes that he has not alleged that any Oregon investor was injured by the Scheme. Instead, Plaintiff argues that all Defendants caused foreseeable general economic harm

---

[22] Plaintiff also relies on the Ninth Circuit's decision in *Silk*, in which the Ninth circuit found that the plaintiff had made out a prima facie case of personal jurisdiction. 65 F.4th at 456-59. That case, like *Helicopter Transport*, also is distinguishable. As the Ninth Circuit has explained, *Silk* "illustrates the level of substantial connections under a contractual relationship that may suffice" to establish purposeful availment. *Davis*, 71 F.4th at 1165 (construing *Silk*). In *Silk*, the defendant's "purposeful contact" with the forum plaintiff created a "decades-long business relationship" "that envisioned continuing and wide-reaching contacts" with the plaintiff in the forum. 65 F.4th at 457 (quoting *Burger King*); *see also id.* at 456 (detailing facts supporting personal jurisdiction over the defendant, including, among other things, work that the plaintiff performed for the defendant in the forum; defendant's payments for those services into the plaintiff's forum bank account; the contract's references to the forum state; the plaintiff's retention of counsel in the forum on behalf of the defendant; and in-person meetings in the forum related to the services the plaintiff provided). In *Silk*, the nonresident defendant hired the plaintiff to provide tax- and estate-planning services, which were performed by the plaintiff *in the forum state* and *for the defendant*. *Id.* at 448-49, 456. Here, however, Plaintiff alleges that a non-party forum resident (Ikkurty, acting on behalf of Jafia LLC) hired a nonresident defendant (Intertrust Corporate) to perform work, none of which was performed in Oregon. In addition, the "continuing obligations" under the contracts at issue in *Silk* were more extensive than those alleged here, including, among other things, a "binding obligation on [the defendant's] estate" to pay the plaintiff certain fees upon the defendant's death (which did not occur until more than two decades after the parties entered into the contracts). *See id.* at 449, 457. Plaintiff has not pointed to any comparable "continuing obligations" that the Administrative Services Agreement imposed on Intertrust Corporate. *Silk* does not meaningfully support this Court's exercise of personal jurisdiction over Intertrust Corporate.

[23] For reasons explained above, Rose City Income Fund II appears to be the only Fund relevant to this analysis.

to Oregon because their actions furthered the efforts of fraudsters operating the Scheme from

within the state. Plaintiff has not, however, pointed to any case in which a court found

allegations of such general harm, standing alone, to be "jurisdictionally sufficient." *See Yahoo!*

*Inc.*, 433 F.3d at 1207. In support of his argument, Plaintiff invokes two district court cases,

*Ciuffitelli v. Deloitte & Touche LLP* (*Ciuffitelli II*), 2018 WL 4568737 (D. Or. Aug. 1, 2018),

*report and recommendation adopted*, 2018 WL 4568586 (D. Or. Sept. 21, 2018), and *Hawes v.*

*Kabani & Co.*, 182 F. Supp. 3d 1134 (W.D. Wash. 2016). The facts of those cases, however, are

distinguishable, and both cases may be inconsistent with recent Ninth Circuit law.

　　Unlike Plaintiff here, the nonresident plaintiff-investors in those cases alleged that they

suffered harms that resulted, directly, from specific harms that the defendants caused to forum

entities. In *Ciuffitelli II*, the plaintiffs included Oregon- and California-based investors who lost

money in a Ponzi-like scheme operated in the forum state (Oregon). 2018 WL 4568737, at *19,

*25. The plaintiffs alleged that one of the defendants (a financial services company specializing

in valuing commercial assets) knew and agreed that its overstated valuations *of two Oregon*

*companies*, along with the defendant's name and clout, "would be used in Oregon offering

documents, by an Oregon seller, to sell securities from Oregon, to Oregon purchasers." *Id.* at

*18, *20. Thus, to the extent that the California-based investors suffered harm, that harm was a

direct result of specific, foreseeable harm that the defendant's acts caused in Oregon to Oregon-

based entities. Similarly, in *Hawes*, the court exercised specific personal jurisdiction over

nonresident defendants where the nonresident plaintiff-investors alleged that the defendants had

conducted an overstated audit of a forum-based company, leading to the company's failure and

thereby harming the plaintiff-investors. 182 F. Supp. 3d at 1141. In this case, however, Plaintiff

has not alleged any specific harm to an Oregon business that was both a foreseeable result of

intentional acts expressly aimed at Oregon and a but-for cause of Plaintiff's losses. Instead, Plaintiff alleges only generalized harm to the forum resulting from Intertrust Corporate's assistance to Ikkurty in carrying out the Scheme.

In addition, the conclusion that the purposeful direction test may be satisfied when the harm to the plaintiff occurs outside the forum state may be inconsistent with the Ninth Circuit's recent decision in *Davis*. As the Ninth Circuit explained in *Davis*: "Under the purposeful direction test, haling [the defendant] into court in [the forum state] for a harm that was suffered elsewhere does not satisfy due process." 71 F.4th at 1163; *see also Alhathloul v. DarkMatter Grp.*, 2023 WL 2537761, at *8 (D. Or. Mar. 16, 2023) ("Plaintiff cites to no authority to support her theory that harm to a third party in the forum, rather than harm to the plaintiff, constitutes a jurisdictionally sufficient amount of harm. Instead, recent caselaw within the Ninth Circuit makes clear that the focus for this element of the jurisdictional analysis must be on the foreseeability of harm caused in the forum to the plaintiff, not to a third party not otherwise involved in the litigation." (cleaned up)). Notably, the plaintiffs in *Davis* alleged the sort of derivative harm that Plaintiff alleges in this case: the plaintiffs alleged that the nonresident defendant contracted with a forum-based entity and took actions pursuant to that contract, and those actions resulted in harm to the nonresident plaintiffs. *See* 71 F.4th at 1160. The court found such harm insufficient. *See id.* at 1163.

Even assuming, without deciding, that Plaintiff has shown an intentional act expressly aimed at Oregon, Plaintiff has not shown foreseeable harm in Oregon that satisfies the third prong of the effects test for purposeful direction. Because a "lack of forum-state harm is

dispositive," the Court does not reach the other elements of the effects test. *See id.*[24] For all the above reasons, Plaintiff has not shown that this Court may exercise personal jurisdiction over Intertrust Corporate. Accordingly, the Court dismisses Plaintiff's claims against Intertrust Corporate for lack of personal jurisdiction under Rule 12(b)(2).

### b. PNC

#### i. Jurisdictional Facts

##### (A) Plaintiff's Allegations

Plaintiff alleges the following facts, which Plaintiff argues are relevant to whether this Court may exercise jurisdiction over PNC:

- PNC's principal place of business is in Pennsylvania. SAC ¶ 9-vii.

- In April 2021, Avadhanam opened the Seneca Ventures PNC Account, which was used as a "feeder account" that received investor deposits, some of which the investors labeled as "investments" or for "Rose City." SAC ¶ 39.

- The business address provided for the Seneca Ventures PNC Account was in Wyoming. SAC ¶ 41.

- Ikkurty was the majority owner and managing member of Seneca Ventures, which he controlled from his Oregon address. SAC ¶ 19; ECF 107 at 29 (citing ECF 98-3 (Operating Agreement for Seneca Ventures)[25]).

- PNC knew that Ikkurty was Seneca Ventures' "beneficial owner and control person," and knew that Seneca Ventures' address was the same Oregon address used by Ikkurty. ECF 107 at 43 (citing ECF 98 (Pavlovic Decl.) ¶ 5).

- The funds in the Seneca Ventures PNC Account were pooled and transferred to another bank used in connection with the Scheme to complete the individual investors' purported "investment" transactions, and the transfers had as beneficiary Rose City Income Fund II,

---

[24] In addition, because Plaintiff has not satisfied the first element of the minimum contacts test for personal jurisdiction, the Court does not consider whether Plaintiff has satisfied the remaining elements. *See Picot*, 780 F.3d at 1213 n.2.

[25] PNC provides the Seneca Ventures Operating Agreement in support of its motion to dismiss for lack of personal jurisdiction.

which had an address in Oregon. SAC ¶ 9; ECF 107 at 44 (citing Pavlovic Decl. ¶ 6; ECF 107-3 at 8).

### (B) PNC's Undisputed Assertions

In support of its motion to dismiss, PNC asserts the following facts, supported by

affidavit and additional evidence, and none of which Plaintiff disputes:

- Avadhanam, an Illinois resident, opened the Seneca Ventures PNC Account in person at a retail branch in Illinois. ECF 96 at 8-9.

- Avadhanam was the sole signer on the account. *Id.* at 9.

- Ikkurty was not an owner or signer on the account. ECF 98 ¶ 4.

- Funds were withdrawn from the Seneca Ventures PNC Account in ten transactions, none of which touched Oregon, and none of which went to investors, specifically:

  - (1) Avadhanam withdrew seven cashiers checks from the account at a PNC branch in Illinois.

  - (2) Avadhanam initiated two wire transfers for beneficiary Rose City Income Fund II, both of which directed PNC to transfer funds to a bank *in California.*

  - (3) to close the account, PNC mailed, from an Illinois branch, a cashier's check to an Illinois address for Seneca Ventures that Avadhanam had provided. ECF 96 at 7.

### (C) Disputed Allegations

In the SAC, Plaintiff makes the following allegations, both of which PNC disputes by

affidavit and evidence:

- "On a number of occasions, PNC [Bank] wired funds to one of Ikkurty's accounts in Portland, noting his Portland address as the beneficiary of the transfer." SAC ¶ 42.

- "On at least one instance, funds were wired out of the [PNC Seneca Ventures Account] directly to Ikkurty, while he was located in Portland." *Id.*

PNC asserts that both of those allegations are demonstrably false. Regarding the first allegation,

regarding a wiring of funds "to one of Ikkurty's accounts in Portland," PNC notes that it in fact

wired funds to accounts for Rose City Income Fund II, not Ikkurty, and those bank accounts

were in California, not Oregon. Second, regarding Plaintiff's allegation about funds wired "directly to Ikkurty, while he was located in Portland," PNC points out that in none of the ten transactions involving funds transferred out of the Seneca Ventures PNC Account did the funds go to Ikkurty (regardless of where he may have been located). Considering the evidence provided by PNC and Plaintiff's failure to provide contrary evidence, the Court does not credit Plaintiff's disputed allegations regarding PNC. *See AMA Multimedia*, 970 F.3d at 1207.

### ii. Application

As to PNC, Plaintiff cannot satisfy either the test for purposeful direction or the test for purposeful availment, and therefore cannot satisfy the first prong of the minimum contacts test for specific personal jurisdiction.

As for purposeful direction, Plaintiff has not pointed to any intentional act by PNC expressly aimed at Oregon. Plaintiff does not allege that PNC affirmatively sought to create a business relationship with Ikkurty or anyone else in Oregon. Standing alone, PNC's decision to enter into an agreement with a business registered in Wyoming (Seneca Ventures) to create a bank account is not a "deliberate[] reach[ing] out" by PNC to Oregon—even if Ikkurty was the majority owner and managing member of that business. *See Davis*, 71 F.4th at 1163 (quotation marks omitted). Similarly, accepting deposits by investors into a bank account belonging to Seneca Ventures—deposits that are not even alleged to have been from persons residing in Oregon—is not intentional conduct "expressly aimed at [Oregon]." *See Brayton Purcell*, 606 F.3d at 1129. Nor do transfers *out* of the Seneca Ventures PNC Account to a California bank constitute conduct expressly aimed at Oregon—even if, as Plaintiff alleges, PNC knew that an Oregon resident was linked to the beneficiary of the California bank account (Rose City Income Fund II). "Attenuated" contacts that a defendant makes "by *interacting* with other persons affiliated with [a forum] State" are insufficient to confer specific personal jurisdiction. *See*

PAGE 31 – OPINION AND ORDER

*Walden*, 571 U.S. at 286 (emphasis added). Here Plaintiff has not even shown interactions between PNC and Ikkurty.

Finally, even if Plaintiff had shown that PNC took an intentional act expressly aimed at Oregon, Plaintiff has not alleged any specific facts showing that *any* of PNC's actions related to the Seneca Ventures PNC Account or any party caused a cognizable harm that PNC knew was likely to be suffered in Oregon. As discussed, Plaintiff concedes that he has not alleged that any Oregon investor was injured by the Scheme, but instead alleges "general . . . economic harm" to Oregon because Defendants' actions furthered the efforts of fraudsters operating the Scheme from within the state. For the reasons explained above, the Court finds that allegation of general economic harm insufficient to satisfy the third prong of the effects test for purposeful direction.

In sum, Plaintiff has not shown "suit-related conduct" *by PNC* that created a "substantial" or "meaningful" connection with Oregon as required for this Court to exercise specific personal jurisdiction over PNC based on purposeful direction. *See Walden*, 571 U.S. at 284, 290; *see also, e.g.*, *Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 433-34 (5th Cir. 2014) (finding no specific jurisdiction over a foreign bank based on wire transfers to and from the forum because the transfers were not initiated by the bank); *Thuney v. Lawyer's Title of Ariz.*, 2019 WL 467697, at *6 (D. Ariz. Feb. 6, 2019) (collecting cases showing that "federal courts routinely decline to use money transfers as a basis for specific jurisdiction"). Nor has Plaintiff shown that PNC's "entire course of dealing" with Oregon demonstrates a "purposeful[] avail[ment] . . . of the privilege of conducting activities within [Oregon], thus invoking the benefits and protections of its laws." *See Davis*, 71 F.4th at 1163 (quotation marks omitted); *cf. Ford*, 141 S. Ct. at 1029 ("In conducting so much business in Montana and Minnesota, Ford enjoys the benefits and

protection of their laws—the enforcement of contracts, the defense of property, the resulting formation of effective markets." (cleaned up)).

Under either test for specific personal jurisdiction, Plaintiff has not demonstrated a "strong relationship among [PNC], the forum, and the litigation," *id.* at 1021 (quotation marks omitted), that arose out of contacts that PNC *itself* created with the forum state, *see Walden*, 571 U.S. at 284. Because Plaintiff fails to show that PNC purposefully directed its activities toward Oregon or purposefully availed itself of the privileges of conducting its business in Oregon, the court cannot exercise personal jurisdiction over PNC. Accordingly, the Court grants PNC's motion to dismiss for lack of personal jurisdiction.

## B. Motions to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

As previously noted, Plaintiff asserts three claims under Oregon Securities Law (First, Second, and Third Claims), and an Oregon common-law claim of joint liability for tortious conduct (Fourth Claim). In their Joint Motion, JPMC, PNC, KeyBank, and Columbia, move to dismiss all four claims for failure to state a claim under Rule 12(b)(6). The Intertrust Defendants also move to dismiss all four claims under Rule 12(b)(6). As discussed, Plaintiff has failed to show that the Court has personal jurisdiction over PNC or Intertrust. The Court therefore considers only whether to grant the Bank Defendants' Joint Motion as to JPMC, KeyBank, and Columbia.

### 1. Standards

A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all

well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). A court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). A court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

### 2. Claims Under the Oregon Securities Law (First, Second, and Third Claims)

#### a. Plaintiff's Claims

Plaintiff asserts three claims against Defendants under the Oregon Securities Law. Plaintiff's First Claim alleges Defendants' nonseller (or secondary) liability under ORS § 59.115(3) for Defendants' alleged involvement in the sale of unregistered securities in

violation of ORS § 59.055—sales for which the Jafia Group is allegedly liable as sellers under ORS § 59.115(1)(a). *See Comp. Concepts, Inc. v. Brandt*, 137 Or. App. 572, 581 (1995) ("[L]iability under ORS [§] 59.115(3) is dependent on and derivative from the liability of a seller."). ORS § 59.115(3) provides in pertinent part: "Every person[26] who participates or materially aids in the sale[27]" of a security when such sale violates ORS § 59.115(1), "is . . . liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based." ORS § 59.115(1)(a), in turn, imposes liability on any person who "[s]ells or successfully solicits the sale of a security, other than a federal covered security, in violation of the Oregon Securities Law"; and ORS § 59.055 makes it unlawful to sell any unregistered security in Oregon, subject to enumerated exceptions not relevant here. Thus, Plaintiff brings his First Claim against Defendants under ORS § 59.115 for "participat[ing] or materially aid[ing]" in the unlawful sale of unregistered securities.

Plaintiff's Second Claim alleges Defendants' nonseller (or secondary) liability under ORS § 59.115(3) for their involvement in Ikkurty's and Avadhanam's violations of ORS § 59.115(1)(b) and ORS § 59.135(1) and (3). As noted above, ORS § 59.115(3) imposes liability on "[e]very person who participates or materially aids in the sale" of a security when the sale violates ORS § 59.115(1). ORS § 59.115(1)(b), in turn, imposes liability on any person who

---

26 "Person" is defined broadly to include, *inter alia*, individuals, joint ventures, partnerships, and corporations. ORS § 59.015(14).

27 "'Sale' or 'sell' includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value." ORS § 59.015(17).

"[s]ells or successfully solicits the sale of a security in violation of ORS [§] 59.135 (1) or (3) or by means of an untrue statement of a material fact or [a material omission], and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."[28] As relevant here, ORS § 59.135 makes it unlawful "for any person, directly or indirectly, in connection with the . . . sale of any security or the conduct of a securities business": "(1) To employ any device, scheme or artifice to defraud;" or "(3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person[.]" Thus, Plaintiff brings his Second Claim against Defendants under ORS § 59.115 for participating or materially aiding in the fraudulent acts of Ikkurty and Avadhanam taken "in connection with" the sale of securities or the conduct of their securities business.

Plaintiff's Third Claim alleges Defendants' nonseller (or secondary) liability under ORS § 59.137(1) for their involvement in Ikkurty's and Avadhanam's violations of ORS § 59.135(1), (2), and (3). ORS § 59.137(1) imposes liability on "[a]ny person who . . . materially aids in a violation of ORS [§] 59.135(1), (2), or (3)." In addition to the acts specified in subsections (1) and (3) of ORS § 59.135 (as set forth above), the statute makes it unlawful "for any person, directly or indirectly, in connection with the . . . sale of any security," "(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"[29] Thus, Plaintiff brings his Third Claim against Defendants under § 59.137(1) for

---

[28] In setting forth the Second Claim, the SAC refers to predicate violations of "ORS [§] 59.135(1)-(3)"—*i.e.*, subsection (2), in addition to subsections (1) and (3)—but the only subsections of ORS § 59.135 cross-referenced in ORS § 59.115 are subsections (1) and (3).

[29] Although both ORS § 59.115(1)(b) and ORS § 59.135(2) discuss material misstatements and material omissions with respect to predicate unlawful acts by sellers, the

participating or materially aiding in the fraudulent acts of Ikkurty and Avadhanam taken "in connection with" the sale of securities or the conduct of their securities business.[30]

### b. Analysis

In support of his First, Second, and Third Claims, Plaintiff alleges that the Bank Defendants participated or materially aided in the unlawful sales of securities because the offering documents used to sell interests in the Rose City Funds and to sell promissory notes "made clear that the sale was not complete, and the interest not transferred, until the funds were received and accepted for deposit by one of the [Bank Defendants]." SAC ¶¶ 178 (First Claim), 192 (Second Claim), 207 (Third Claim). In support of his Second and Third Claims, Plaintiff further alleges that the Bank Defendants participated and materially aided in those sales by "processing monthly distributions to existing investors using newly invested capital, thus perpetuating the [S]cheme and allowing it to continue unabated for over a year."[31] SAC ¶¶ 194

provisions "differ in the required connection between the misstatement or omission and the sale of securities." *Ciuffitelli ex rel. Tr. of Ciuffitelli Revocable Tr. v. Deloitte & Touche LLP* (*Ciuffitelli I*), 2017 WL 2927481, at *9 (D. Or. Apr. 10, 2017), *report and recommendation adopted sub nom. Ciuffitelli v. Deloitte & Touche LLP*, 2017 WL 2927150 (D. Or. July 5, 2017). "Under ORS § 59.115(1)(b), a violation occurs when 'a person sells or successfully solicits the sale of a security . . . by means of' a material false statement or omission," whereas "ORS § 59.135(2) applies more broadly, applying to material misstatements or omissions made 'directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business.'" *Id.*

[30] Plaintiff's Third Claim is similar to the Second Claim, although the claims involve slightly different standards for the predicate unlawful acts, *see supra* note 29, and the two relevant statutes that impose secondary liability on nonsellers—ORS § 59.115(3) (for Claim One) and ORS § 59.137 (for Claim Two)—provide for different remedies. *See* Oregon State Bar, 1 Advising Oregon Businesses § 18.3-14 (2017) ("Unlike ORS [§] 59.115 . . . , which provide[s] for rescissionary damages, ORS [§] 59.137 permits the recovery of actual damages.").

[31] Although Plaintiff alleges that *all* Bank Defendants processed these distributions, the SAC discusses only one specific PNC Bank account (the Seneca Ventures PNC Account), which was allegedly used as a "feeder account" that received small deposits from investors, "after which the funds were pooled and transferred to another bank utilized in connection with the

(Second Claim); 209 (Third Claim). The Bank Defendants move for dismissal of Plaintiff's first three claims on the ground that, as a matter of law, neither the acceptance of deposits of investor funds into a general bank account, nor the processing of transfers out of an account, constitute "participation" or "material aid" in the "sale" of a security within the meaning of ORS § 59.115(3) or ORS § 59.137(1).[32] ECF 90 at 17.

The plain text of the Oregon Securities Law forecloses the Bank Defendants' argument that normal business activities such as providing "routine depository services" cannot, as a matter of law, give rise to nonseller liability. The statute specifically contemplates that the provision of merely "ministerial functions of escrow, custody[,] or deposit services" may constitute participation or material aid in the sale of a securities. Specifically, ORS § 59.115(4), which qualifies nonseller liability that otherwise may exist under subsection (3), states:

> Notwithstanding the provisions of subsection (3) of this section, a person whose *sole function* in connection with the sale of a security is to provide ministerial functions of escrow, custody[,] *or deposit services* in accordance with applicable law *is liable* only *if* [1] *the person participates or materially aids in the sale* and [2] the purchaser sustains the burden of proof that the person knew of the existence of facts on which liability is based or that the person's failure to know of the existence of such facts was a result of the person's recklessness or gross negligence.

The Bank Defendants' argument that the provision of normal banking services, including "routine depository services," can *never* constitute "participation" or "material aid" cannot be squared with the plain terms of subsection (4). That subsection specifically contemplates a

---

[Scheme]." SAC ¶ 39. Because the Court lacks jurisdiction over PNC as to all claims, the Court does not further address this discrepancy.

[32] The Court has considered and finds unpersuasive the Bank Defendants' additional argument that Plaintiff has failed to satisfy the pleading requirements of Rule 9(b) with respect to the predicate fraudulent acts of Ikkurty and Avadhanam.

nonseller participating or materially aiding in a sale even if the *only* function of the nonseller is to provide "ministerial functions of . . . deposit services"; if so, a buyer-plaintiff who seeks to recover on a theory of nonseller liability faces an additional burden of proof.[33] The Bank Defendants' proposed interpretation would also contravene the Oregon Supreme Court's instruction that the Oregon Securities Law is "to be liberally construed to afford the greatest possible protection to the public." *See Adamson v. Lang*, 236 Or. 511, 516 (1964); *also cf. Adams v. Am. W. Sec., Inc.*, 265 Or. 514, 530 (1973) (rejecting as "absurd" an interpretation of the Oregon Securities Law that would grant a "complete defense" to a person "who, with full knowledge of the unlawful solicitation of an offer to purchase an unissued and unregistered security, proceeds to make the further arrangements necessary for issuance and delivery of such a security" (quotation marks omitted)); *Prince v. Brydon*, 307 Or. 146, 150 (1988) (ratifying *Adams* and explaining that under ORS § 59.115(3), "[t]he defense against strict liability" is "a showing of ignorance, not the professional role of the person who renders material aid in the unlawful sale").

Defendants also argue that under the facts of this case, neither the acceptance of deposits nor the processing of transfers could constitute "participation" or "material aid" in the sale of securities because, according to the Bank Defendants, those activities "did not enable the sale[s] to occur." ECF 90 at 10. That argument is unpersuasive—at least with respect to the activity of accepting deposits. The Bank Defendants contend that the investor funds were received only *after* the sales had been completed and the investors had executed the required subscription

---

[33] Whether any of the services provided by any Bank Defendant in this case are "ministerial" within the meaning of subsection (4) is a question for summary judgment or trial. If so, Plaintiff will be subject to the additional burden set forth therein. At this stage, the Court is satisfied that if subsection (4) does apply, Plaintiff's allegations are sufficient to survive the Bank Defendants' Joint Motion.

agreements—"transaction[s] that," according to the Bank Defendants, "would have occurred regardless of where the funds were sent after the fact." *Id.*

Plaintiff alleges, however, that the subscription agreements through which he and other defrauded investors purchased interests in the Rose City Funds and purchased promissory notes provided that the sales were not complete until the investors completed certain steps, including wiring money to a particular account, and until the funds had been received and accepted for deposit. SAC ¶¶ 36, 84, 178, 192, 207. It is unclear how a sale under such an agreement could be complete without a bank accepting funds for deposit. For these reasons, the Court rejects the Bank Defendants' argument that that acceptance of deposits cannot constitute "participation" or "material aid" in the sale of a security within the meaning of the Oregon Securities Law.[34] Accordingly, the Court finds that Plaintiff has plausibly stated claims under the Oregon Securities Law against KeyBank and Columbia. Plaintiff alleges that his purchase of an interest in Rose City Fund II was not complete until he wired funds to an account at KeyBank, and that his purchase of the Promissory Note was not complete until funds were received and accepted for deposit by Umpqua.

As to JPMC, however, Plaintiff has failed to state a claim under the Oregon Securities Law. The only accounts that Ikkurty and Avadhanam are alleged to have opened at JPMC in furtherance of the Scheme were not opened until *after* the sales of securities to Plaintiff were complete. Plaintiff alleges that he completed his purchases of securities in March 2021, but

---

[34] Because the Court rejects the Bank Defendants' argument that that the activity of accepting deposits cannot, as a matter of law, constitute "participation" or "material aid" in the sale of securities, and on that basis declines to dismiss Plaintiff's claims brought under the Oregon Securities Law, the Court does not address in this Opinion and Order whether any other actions allegedly taken by the Bank Defendants, including the processing of distribution payments, might give rise to liability under ORS § 59.115(3) or ORS § 59.137(1), either as a matter of law or under the facts of this case.

alleges no actions taken by JMPC before April 2021.[35] Even assuming Plaintiff can show that JPMC's alleged participation or material aid in the sales of securities to *other* class members caused Plaintiff a cognizable injury, the provisions of the Oregon Securities Law that might impose liability for those sales would not support *Plaintiff's* claims against JPMC. As discussed, Plaintiff's First and Second Claims allege nonseller liability under ORS § 59.115(3), and Plaintiff's Third Claim alleges nonseller (or secondary) liability under ORS § 59.137. Those provisions impose liability on nonsellers who "participate" (under ORS § 59.115(3)) or "materially aid" (under ORS § 59.115(3) and ORS § 59.137(1)) in certain predicate acts related *to a sale of a security*. As relevant here, those provisions make a nonseller liable *to the purchaser of that security*—not to other individuals that may have been harmed by the sale.[36] *See* ORS § 59.115(3) (setting forth circumstances in which a nonseller is liable "to the same extent as the seller" of a security who, under subsection (1), is "liable . . . *to a purchaser*" of the security (emphasis added)); ORS § 59.137(1) (enumerating circumstances in which a nonseller who materially aids in certain fraudulent and deceptive activities "in connection with the . . . sale of any security or the conduct of a securities business" under ORS § 59.135 "is liable *to any purchaser . . . of the security*" (emphasis added)). Because Plaintiff has not alleged any acts by JPMC related to his own purchases of securities, he has failed to state a claim against JPMC under ORS § 59.151(3) or ORS § 59.137(1). For all the above reasons, the Court declines to

---

[35] Plaintiff's allegations about PNC are similar to those about JPMC: he alleges that it was not until after the sales of securities to Plaintiff that Ikkurty and Avadhanam opened an account with PNC in furtherance of the Scheme. Because the Court lacks jurisdiction over PNC, however, the Court does not consider whether Plaintiff has stated a claim against PNC.

[36] ORS § 59.137 also creates liability to the *seller* of a security under specified circumstances, but such liability is not at issue in this case.

dismiss Plaintiff's First, Second, and Third Claims as asserted against KeyBank and Columbia but dismisses those claims as asserted against JMPC.

### 3.  Claim for Joint Liability for Tortious Conduct (Fourth Claim)

Plaintiff's Fourth Claim, which he brings against all Defendants, is for joint liability for the tortious conduct of the Jafia Group. Section 876 of the Restatement (Second) of Torts ("Restatement") "reflects the common law of Oregon" regarding "the circumstances in which a person who assists another in committing a tort ordinarily may be liable for resulting harm to a third party." *Reynolds v. Schrock*, 341 Or. 338, 346 (2006) (quotation marks omitted). Section 876 of the Restatement provides in relevant part:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . [1] knows that the other's conduct constitutes a breach of duty and [2] gives substantial assistance or encouragement to the other so as to conduct himself[.]

A claim of joint liability for tortious conduct requires *actual* knowledge. *See, e.g.*, *Cohrs v. Salomon Smith Barney, Inc.*, 2005 WL 2104535, at *24 (D. Or. Aug. 31, 2005) (concluding, "[b]ased on the phrasing of the *Restatement* section and Oregon case law, . . . that there must be actual knowledge of the fiduciary breach being assisted"), *aff'd sub nom. Stahly v. Salomon Smith Barney, Inc.*, 319 F. App'x 654 (9th Cir. 2009); *Cope v. Price Waterhouse*, 990 F.2d 1256, 1993 WL 102598, at *6 (1993) (unpublished) ("The Second Restatement of Torts . . . supports a finding that actual knowledge is the proper standard for a claim of aiding and abetting fraud.").

Plaintiff alleges that the Bank Defendants knew that members of the Jafia Group were breaching their fiduciary duties, and that the Bank Defendants "provided substantial assistance and encouragement to these breaches" by receiving investor funds for deposit and continuing to process distributions of investor capital "in order to perpetuate the [S]cheme." SAC ¶¶ 224-26.

The Bank Defendants move to dismiss Plaintiff's Fourth Claim on the grounds that Plaintiff has not sufficiently alleged actual knowledge, and that, as a matter of law, "normal" banking activities of depository institutions, such as receiving investor funds and processing distributions, do not constitute "substantial assistance."

As for actual knowledge, the Court is satisfied that the SAC's allegations of actual knowledge are sufficient to survive a motion to dismiss. As for substantial assistance, the Court is not aware of any case from the Oregon Supreme Court or the Oregon Court of Appeals directly addressing whether providing traditional banking services, such as receiving or transferring funds, constitutes substantial assistance, and courts construing the law of other jurisdictions are split on the issue.[37] The Court agrees, however, with the conclusion of the California Court of Appeal in construing California law, which, like Oregon, has expressly adopted Section 876 of the Restatement: "[C]ommon sense tells us that even 'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew that those transactions were assisting the customer in committing a specific tort. Knowledge is the crucial element." *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (2005); *see also In re First All. Mortg. Co.*, 471 F.3d

---

[37] Defendants rely on cases construing and applying New York law on aiding and abetting, *e.g.*, *Williams v. Bank Leumi Tr. Co.*, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (concluding that "the mere fact that all the participants in the alleged scheme used accounts at Bank Leumi to perpetrate it, without more, does not rise to the level of substantial assistance"), and one unpublished case construing and applying Florida law, *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906-07, 906 n.3 (11th Cir. 2012), although the court in that case found dispositive the plaintiff's failure to plausibly allege actual knowledge and did not meaningfully consider what acts might constitute "substantial assistance" under Florida law. Plaintiff relies on cases construing the law of other jurisdictions, including California, which has specifically adopted Section 876 of the Restatement—some of which the Court discusses below.

977, 994-95 (9th Cir. 2006) (adopting *Casey* in construing California law)).[38] Under this standard, Plaintiff's allegations regarding the acceptance of deposits and processing of distributions are sufficient to survive the Bank Defendants' Joint Motion to dismiss under Rule 12(b)(6).[39]

## C.  Plaintiff's Motion to Compel

Plaintiff moves to compel discovery from the Intertrust Defendants. Plaintiff seeks *all* communications between the Intertrust Defendants and Ikkurty, Avadhanam, and any Jafia Group corporate entities. Plaintiff asserts that he needs this discovery to establish personal jurisdiction over the Intertrust Defendants. Regarding communications between Intertrust Corporate and Ikkurty, considering the applicable standards and governing case law discussed above, it is not clear how those communications might establish personal jurisdiction here over Intertrust Corporate. *See, e.g.*, *Walden*, 571 U.S. at 285 (explaining that the "'minimum contacts'

---

[38] The California Court of Appeal ratified *Casey*'s holding in *Frame v. PricewaterhouseCoopers LLP*, 36 Cal. Rptr. 3d 209, 220-21 (2005), *review granted sub nom. Frame v. PricewaterhouseCoopers*, 132 P.3d 210 (Cal. 2006), *application for dismissal of review granted*, 143 P.3d 657 (Cal. 2006). That holding has also been adopted and applied by the Ninth Circuit, *see In re First All. Mortg. Co.*, 471 F.3d at 994-95, numerous district courts applying California law, *see, e.g.*, *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 960 (2014) (relying on *Casey* in concluding that "provided that an entity takes *some* action, even routine operations may constitute substantial participation if done with knowledge that the action will further a breach of fiduciary duty" (emphasis in original)), and been approved of by courts in other jurisdictions in construing and applying Section 876, *see, e.g.*, *El Camino Res., LTD v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 911 (2010) ("Ordinary business transactions that a bank performs for its customer can satisfy the substantial assistance element of an aiding-and-abetting claim only if the bank 'actually knew that those transactions were assisting the customer in committing a specific tort'" (quoting *Casey*)).

[39] Whether Plaintiff can show evidence sufficient to survive summary judgment on the issue of "substantial assistance" is another matter. *See* Restatement (Second) of Torts § 876 (1979) cmt. d (setting forth considerations relevant to determining whether "assistance of or participation by the defendant may be so slight that he is not liable for the act of the other," including "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind").

analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there"). In any event, Plaintiff's requests are overly broad. Accordingly, the Court denies Plaintiff's Motion to Compel.

## CONCLUSION

The Court GRANTS Intertrust Group BV and Intertrust Corporate and Fund Services LLC's motion to dismiss (ECF 91), for lack of personal jurisdiction under Rule 12(b)(2). The Court GRANTS PNC Bank, N.A.'s motion to dismiss (ECF 96), for lack of personal jurisdiction under Rule 12(b)(2). The Court GRANTS IN PART the joint motion to dismiss filed by JPMorgan Chase Bank, N.A., PNC Bank, N.A., Columbia Banking System, Inc., KeyBank National Association, Evolve Bank and Trust, and Mercury Technologies, Inc. (ECF 90). Specifically, as to JPMorgan Chase Bank, N.A., the Court dismisses Plaintiff's First, Second, and Third Claims, alleging secondary liability under the Oregon Securities Law, but declines to dismiss Plaintiff's Fourth Claim, alleging joint liability for tortious conduct, as asserted against JPMorgan Chase Bank, N.A. As to KeyBank National Association and Columbia Banking System, the Court denies the joint motion to dismiss on all claims. Because the Court dismisses all claims against PNC Bank, N.A. for lack of personal jurisdiction under Rule 12(b)(2), the Court does not consider whether any claim as asserted against PNC Bank, N.A. also is subject to dismissal under Rule 12(b)(6). In addition, because Plaintiff has reached settlement agreements in principle with Evolve Bank and Trust and Mercury Technologies, Inc., the Court does not make any findings or rulings on the joint motion to dismiss as to those Defendants. The Court also denies without prejudice and with leave to renew Evolve and Mercury's supplemental motions to dismiss under Rule 12(b)(2) (ECF 94, 92). Accordingly, Plaintiff may proceed on the following claims: (1) First, Second, and Third Claims, under the Oregon Securities Law, as asserted against KeyBank National Association and Columbia Banking System; and (2) Fourth

Claim, for joint liability for tortious conduct, as asserted against JPMorgan Chase Bank, N.A., KeyBank National Association, and Columbia Banking System. The Court DENIES Plaintiff's motion to compel (ECF 129). If Plaintiff believes that he can cure the deficiencies identified in this Opinion and Order, Plaintiff may file a Third Amended Complaint by August 30, 2024.

**IT IS SO ORDERED**.

DATED this 1st day of August, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge