**Michael Fuller, OSB No. 09357**
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
michael@underdoglawyer.com
Phone 503-222-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **AMIT FATNANI** and **SRINIVAS GURUZU,** individually, and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>vs<br><br>**JPMORGAN CHASE & CO.; KEYBANK NATIONAL ASSOCIATION; COLUMBIA BANKING SYSTEM, INC. AS SUCCESSOR TO UMPQUA HOLDINGS CORPORATION; INTERTRUST CORPORATE AND FUND SERVICES, LLC; EVOLVE BANK AND TRUST; and MERCURY TECHNOLOGIES INC.,**<br><br>Defendants. | Case No. 3:23-cv-00712<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT**<br><br>Violations of Oregon Securities Law<br><br>Aiding and Abetting Breach of Fiduciary Duty<br><br>Demand for Jury Trial |

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 1 of 60

## AMENDED CLASS ACTION COMPLAINT

1.  A bank should always be careful when providing financial services to an account holder, especially when certain "red flags" are present.

2.  If a bank is not careful, the bank may be liable for losses if its financial services are used in furtherance of illegal actions like the unregistered sale of securities or the operation of a Ponzi Scheme.

3.  Under Oregon law, a bank is liable if it participates in, or provides material aid to, these types of illegal activities.

4.  In 2022, a Portland man named Sam Ikkurty and his business partner Ravi Avadhanam were charged by the Commodity Futures Trading Commission ("CFTC") with organizing a Ponzi scheme that utilized a complicated web of affiliate limited partnership and limited liability companies (defined *infra* as the "Jafia Group") to defraud nearly $50 million dollars from 170 individuals through the unlawful and misleading sales of unregistered securities.

5.  Avadhanam has pleaded guilty to running a Ponzi scheme. On August 4, 2023, he entered into a Consent Order with the CFTC admitting that:

    > At all relevant times, the Defendants pooled participant funds, and then, at Ikkurty's direction, distributed the majority of those funds as "profits," "dividends," "distributions," or income to other participants in a manner akin to a Ponzi scheme, or transferred

funds to accounts controlled by and/or for the benefit of Ikkurty
[and the Jafia Group.]

[...]

Of the more than $44 million Defendants, at Ikkurty's direction,
accepted from participants after January 2021, they transferred
more than half to other participants or entities owned and
controlled by Ikkurty …. Defendants Ikkurty and Jafia also
transferred approximately $18 million to an off-shore entity, and
never returned any profits, earnings or funds of any kind from the
entity to any Rose City or Seneca account for distribution to
participants.

6.    The CFTC charged Ikkurty with being the mastermind of this Ponzi scheme,
known as the "Rose City Ponzi Scheme." True to its name, the scheme was, in
Ikkurty's own words, "based out of Portland, Oregon."

7.    The United States District Court for the Northern District of Illinois, which is
overseeing the CFTC matter, entered judgment in favor of the CFTC and
against Ikkurty and Jafia on all counts on July 22, 2024, after having granted
the CFTC's motion for summary judgment on July 1, 2024 and labeling Rose
City "a classic Ponzi scheme."

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 3 of 60

8.   Plaintiffs Amit Fatnani, an individual who lost $350,000, and Srinivas Guruzu, an individual who lost $55,000, now file this class action to hold various banks accountable for their roles in the Rose City Ponzi Scheme. At trial they will present evidence that each of the defendants in this case either participated in, or provided material aid to, the Ponzi Scheme organizers. The evidence will show that the Ponzi Scheme would not have been possible without the active participation of the defendants in this case, each of whom are liable under Oregon law for their roles in the unlawful and misleading sales of unregistered securities.

## INTRODUCTION

9.   Amit Fatnani ("Amit"), an individual who is a resident of the State of California, and Srinivas Guruzu ("Srinivas"), an individual who is a resident of the State of Texas, together ("Plaintiffs"), hereby file this Fourth Amended Class Action Complaint against Defendants:

   i.   Columbia Banking System, Inc. as successor to Umpqua Holdings Corporation ("Umpqua"), a financial services company whose principal place of business is 445 SE Main, Roseburg, OR 97470.

   ii.  JPMorgan Chase Bank, N.A, dba JPMorgan Chase Bank ("JPMC"), a financial services company whose principal place of business is at 270 Park Ave 31st Floor, New York, NY 10017.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 4 of 60

**iii.** KeyBank National Association ("KeyBank"), a financial services company whose principal place of business is 127 Public Sq, Cleveland, OH 44114.

**iv.** Intertrust Corporate and Fund Services, LLC ("Intertrust"), a financial services company whose principal place of business is 80 Cottontail Lane, Suite 430 Somerset, NJ 08873.

**v.** Evolve Bank and Trust ("Evolve"), a financial services company whose principal place of business is 6070 Poplar Avenue, Suite 200, Memphis, TN 38119.[1]

**vi.** Mercury Technologies, Inc. ("Mercury"), a financial technology company whose principal place of business is 81 Langton Street, Unit 4, San Francisco, CA, 94103.

Collectively, Umpqua, JPMC, KeyBank, Intertrust, Evolve, and Mercury are sometimes referred to collectively as "Defendants." Umpqua, JPMC, and KeyBank are sometimes referred to as "Defendant Banks." Plaintiffs now

---

[1] On May 6, 2025 the Court entered an Order approving Plaintiffs' class action settlements with Evolve and Mercury Technologies, Inc. ("Mercury"). (*See* ECF No. 164). As of this filing the Court has not yet entered final judgment dismissing Evolve or Mercury from this lawsuit. Plaintiffs anticipate filing a motion for entry of a partial final judgment as to the claims against Evolve and Mercury in the near future, and out of an abundance of caution they are therefore identified as nominal defendants in this Fourth Amended Class Action Complaint. For the avoidance of doubt, Plaintiffs understand and agree that all claims against Evolve and Mercury are settled in accordance with the Court's May 6, 2025 Order, and further aver that nothing herein is intended to add any new allegations or claims against Evolve and/or Mercury or to otherwise disturb the Court's prior final approval Order.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 5 of 60

allege on personal knowledge, investigation of their counsel, and information and belief as follows:

## INTRODUCTION AND NATURE OF ACTION

10. From as early as October 2017 up until May 2022, Sam Ikkurty ("Ikkurty"), a Portland, Oregon resident, and his employee Ravishankar Avadhanam ("Avadhanam"), operated a cryptocurrency Ponzi Scheme ("Rose City Ponzi Scheme") from Ikkurty's apartment in Portland.

11. Ikkurty and Avadhanam, members of the Indian American community, focused on recruiting Indian American investors, relying on community associations to sow trust.

12. The CFTC filed enforcement proceedings against Ikkurty and Avadhanam (hereafter, the "CFTC Action"). Avadhanam has entered into a consent order with the CFTC establishing, *inter alia*, that he and Ikkurty operated a Ponzi Scheme.

13. Documents provided in connection with the CFTC Action confirm that the Rose City Ponzi Scheme was based in and run out of Portland, Oregon.

14. The CFTC was successful in the enforcement action, as the Honorable Mary R. Rowland entered judgment in favor of the CFTC and against Ikkurty on all counts on July 22, 2024, after having granted the CFTC's motion for summary judgment, calling Rose City "a classic Ponzi scheme."

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 6 of 60

15.   The Rose City Ponzi Scheme involved the sale of unregistered equity securities and promissory notes sold under a purported Rule 506(b) exemption from federal registration. However, as set forth in more detail below, Ikkurty and Avadhanam extensively marketed the scheme, engaging in widespread solicitation efforts that destroyed the purported Rule 506(b) exemption, thus requiring that the securities sold in connection with the Scheme be registered with Oregon's Department of Consumer and Business Services.

16.   Ikkurty and Avadhanam never denied or made any effort to hide their solicitation. In fact, they marketed through a publicly available website, RoseCityFund.com, posted publicly-accessible videos on YouTube and other social media sites, and hosted weekly online information sessions for potential investors to learn about the Rose City Ponzi Scheme.

17.   In connection with these solicitations, they also provided written materials and offering documents describing the Rose City Ponzi Scheme's purported "investment strategy."

18.   It was through the above-referenced online marketing and virtual information sessions, hosted from Ikkurty's Portland residence, that Amit learned of Ikkurty and Avadhanam and the complex web of companies they ran in furtherance of the Rose City Ponzi Scheme, including Ikkurty's company Jafia LLC ("Jafia"), which served as the General Partner of the two "Funds" – Rose

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 7 of 60

City Income Fund, and Rose City Income Fund II (together, "Rose City Funds") – at the center of the Rose City Ponzi Scheme.

19.    Ikkurty and Avadhanam formed another entity, Seneca Ventures, LLC ("Seneca"), to serve as a conduit for smaller investors to "participate" in the Scheme. Seneca's sole purpose was to "pool" investor funds and transfer them into one of the Rose City Funds. Seneca is a Wyoming company that sometimes listed a "dummy" mailbox address in Tampa, Florida as its principal place of business; however, Seneca's true principal place of business was in Portland, Oregon, and Seneca sometimes used Ikkurty's residence address as its own. Neither Ikkurty nor Avadhanam had any connection to the States of Florida or Wyoming.

20.    The Receiver appointed to oversee the unwinding of the Rose City Ponzi Scheme has concluded that Jafia, Seneca, and the Rose City Funds all operated as a cohesive whole under Ikkurty's direction to carry out the Rose City Ponzi Scheme. Accordingly, where appropriate Ikkurty, Jafia, Seneca, and the Rose City Funds are sometimes referred collectively as the "Jafia Group."[2]

21.    The Limited Partnership agreements to invest in the Rose City Funds stated that the investors' money would be used to "invest, hold and trade" different

---

[2] The Jafia Group operated several other LLCs as part of the Scheme, including but not limited to, MySivana, LLC, an LLC controlled by Ikkurty ("MySivana") and Merosa Ventures, LLC, an LLC controlled by Avadhanam ("Merosa").

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 8 of 60

types of digital and crypto currencies. In reality, Ikkurty would pool participant funds, and then distribute the majority of those funds as "profits," "dividends," "distributions," or income to other participants in a manner akin to a Ponzi scheme.

22.   The Jafia Group deceived investors about the actual operations of the Jafia Group, and in particular, that the Rose City Funds operated as a Ponzi scheme perpetuated by the illegal sale of unregistered securities.

23.   As discussed in more detail below, the marketing materials and investment documents, including private placement memoranda, used to sell interests in the Rose City Ponzi Scheme focused heavily on purported distributions to investors.

24.   These marketing materials and investment documents stated, falsely, that these distributions would be paid out of profits generated through trading cryptocurrencies and/or "proof of stake mining." In reality, as Ikkurty and his partner Avadhanam have now both admitted in the CFTC Action, these "distributions" were simply the return of investors' principal.

25.   Ponzi schemes are very rarely carried out without help, and this one was no exception. To perpetrate the Scheme, Ikkurty and Avadhanam established relationships and bank accounts with Defendants and others between August 2020 and May 2022. As set forth in more detail below, Defendants participated in and provided material aid at several critical junctures in the misleading sale

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 9 of 60

of the unregistered interests in the Rose City Ponzi Scheme, including accepting and clearing the funds necessary to complete the unlawful and unregistered sales transactions, and processing supposed "distributions" that kept the scheme afloat for well over a year as Ikkurty continued to lure in new investors.

26.    Unlike investors, the Defendants had a clear view of the Ponzi Scheme the Jafia Group was operating, and rather than trying to put an end to it, they instead decided to profit.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $44,000,000, in the aggregate, exclusive of interest and costs, and the number of claimants exceeds 170 persons.

28.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendants' unlawful course of conduct occurred in large part in this District.

29.    This Court has general and specific personal jurisdiction over Defendant Umpqua as it maintains its principal place of business in the State of Oregon, and further knowingly entered into business relationships with residents of this State in furtherance of an illicit scheme operated out of Portland, Oregon. Additionally, Plaintiffs allege violations of the Oregon Securities Laws, thus conferring personal jurisdiction under Oregon Rule of Civil Procedure 4(J)(2).

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 10 of 60

30.    This Court has specific personal jurisdiction over the other Defendants because they knowingly entered into business relationships with residents of this State in furtherance of an illicit scheme operated out of Portland, Oregon.

31.    Additionally, Plaintiffs allege violations of the Oregon Securities Laws, thus conferring personal jurisdiction under Oregon Rule of Civil Procedure 4(J)(2). The contacts supporting the exercise of personal jurisdiction over these Defendants and putting them on reasonable notice of being hailed into an Oregon Court based on their dealings with Oregon residents giving rise to this lawsuit are discussed in more detail below.

### DEFENDANTS' RELATIONSHIPS WITH THE JAFIA GROUP

#### *Umpqua*

32.    In August 2020, Ikkurty opened a series of Umpqua accounts in the names of Jafia (x5384), "Ikkurty Capital" (x7824 and x8773), MySivana LLC (x5860) and himself (x1238) (collectively, the "Umpqua Accounts").

33.    Approximately $24 million worth of investor money used to purchase securities in the Rose City Funds ultimately landed in the Umpqua Accounts and was moved freely by Ikkurty between his Umpqua Accounts thereafter.

34.    The Umpqua Accounts were also used to issue pre-drawn "distribution" checks that perpetuated the Rose City Ponzi Scheme, but actually consisted of investors' principal.  These checks listed Jafia as the payor, with an address of 7028 West Waters Avenue, Apartment 145, Tampa, Florida. A perfunctory

internet search reveals that address to be a PO Box operated out of a UPS Store.

### *KeyBank*

35.  On December 29, 2020, Ikkurty opened the first of multiple accounts with KeyBank under the name "Rose City Income Fund II" (x2139). Subsequent KeyBank accounts were also opened under Seneca's and Ikkurty's names.

36.  Ikkurty opened these accounts using his Portland address, and statements were sent to that address.

37.  Investors who executed subscription agreements or promissory notes to invest in the Rose City Ponzi Scheme were directed to issue their payments to one of the "Rose City Income Fund II" accounts at KeyBank. The memos on these payments reflected that the payments were made for the purpose of investing in the Rose City Ponzi Scheme.

38.  KeyBank would also wire distributions, consisting of other investors' funds, to investors in the Rose City Ponzi Scheme. KeyBank further wired investors' funds into other accounts Ikkurty controlled for his own benefit, including accounts in his personal name.

39.  Ikkurty conducted in-person banking in furtherance of the Scheme at multiple Key Bank branches in Hillsboro, Oregon.

*JPMC*

40. On April 26, 2013, Ikkurty opened a JPMC account for Ikkurty Capital, LLC (x2650).

41. On July 18, 2019, Ikkurty opened a JPMC account for MySivana LLC (x6986).

42. Ikkurty and Avadhanam opened a JPMC account for Seneca Ventures, LLC, (x2025) on June 14, 2021 (the "JPMC Seneca Account").

43. Ikkurty mainly utilized the Miller Barnes Branch in Portland, Oregon for his transactions in the JPMC Seneca Account.

44. The account opening documents for the JPMC Seneca Account describe Seneca's business as a "technology consulting firm in software programming"; however, no such business was conducted.

45. Rather, the JPMC Seneca Account existed solely to further the Rose City Ponzi Scheme.

46. The JPMC Seneca Account was used as a "feeder account" that received wires and/or deposits from investors—both entities and individuals like Srinivas— labeled as "investments" and/or for "Rose City."

47. From its opening in June 2021, the JPMC Seneca Account had funds rapidly pass through in the form of high-volume, high-value EFT and/or wire transfers.

48. Funds that landed in the JPMC Seneca Account were quickly transferred out to an account at Silvergate Bank for Rose City Income Fund II (x4009) to

complete individual investors' purported "investment" transactions in the Rose City Ponzi Scheme.

49.     More than 90% of the funds that flowed into the JMPC Seneca Account followed the same pattern of rapid transfer to the Silvergate account for Rose City Income Fund II.

50.     JPMC was aware that Ikkurty and Avadhanam owned Rose City Income Fund II, and were further aware that Rose City Income Fund marketed monthly distributions to investors.

51.     Ikkurty has admitted that the funds that went into the JPMC Seneca Account, were deposits by investors necessary to complete their investments in the Rose City Ponzi Scheme.

52.     The remaining funds in the JPMC Seneca Account were transferred to another account for Seneca at a different financial institution to pay "distributions" consisting of other investors' principal. All of these transfers were in furtherance of the Rose City Ponzi Scheme.

53.     There was over $13,000,000 in suspicious transactions in the JPMC Seneca Account between its opening in June 2021 and November 2021, the vast majority of which included or involved investor deposits.

54.     The JPMC Seneca Account remained open even though JPMC was aware of the high number of suspicious transactions.

55.     Srinivas wired funds to the JPMC Seneca Account on November 24, 2021.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 14 of 60

56. JPMC closed the JPMC Seneca Account due to suspicious activity in or around January 2022.

*Intertrust*

57. At all relevant times Intertrust served as the Rose City Funds' "Administrator" responsible for, *inter alia*, processing initial investment transactions, handling distributions, redemptions, preparing account summary documents and statements, and, upon information and belief, assisting with regulatory compliance.

58. Its work with the Rose City Funds was Intertrust's first engagement in the crypto currency world. Intertrust's high-level executives, including its CEO and internal compliance and risk manager, engaged in extensive rounds of negotiations with Ikkurty, which were conducted while he was in Oregon.

59. In connection with its vetting of the engagement, Intertrust obtained actual knowledge of Rose City's business model, including Ikkurty's solicitation efforts in violation of Rose City's purported registration exemption.

60. Nonetheless, Intertrust signed the deal, and its compliance department allowed its name to be utilized in connection with Ikkurty's marketing efforts, including prominent displays listing the Intertrust name and logo and describing Intertrust as the "Rose City Fund Administrator" in the written pitch deck that Ikkurty distributed to prospective investors. Intertrust's role

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 15 of 60

engendered confidence in potential investors as they saw that a well-known administrator was working with Ikkurty.

61.    Investors who wished to invest in the Rose City Funds were directed in the Rose City Subscription Agreement to:

> send completed and executed copies of the documents […] and all attachments and any required supporting documentation to Intertrust Group,    Attn:    Michael    Secondo,    by    e-mail    to Michael.Secondo@Intertrustgroup.com, no later than one (1) Business Day before JAFIA LLC (the "General Partner") elects to accept this capital contribution (the "Admission Date").

Thereafter, Intertrust would verify subscription documents and further ensure the investor had wired money to the Jafia Group's account to complete the sales transaction.

62.    In keeping with its duties as fund administrator, Intertrust had access to and knowledge of financial statements and records from the Rose City Funds that demonstrated that investment capital was pooled together and used to pay distributions to investors, as opposed to paying those out of investment returns as claimed in the marketing materials with Intertrust's name on them.

63.    Intertrust also calculated NAV (net asset values) for Rose City Income Fund II, which it then sent to Ikkurty in Portland for approval before working with him to calculate his fees. On this basis, Intertrust knew that the Fund was not

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 16 of 60

generating any revenue through trading, and instead was simply paying distributions—and fees—out of investor capital.

64. As Administrator, Intertrust nonetheless processed these distributions, knowing they were made on a reduced cost basis (*i.e.*, a return of investor capital).

### *Evolve and Mercury[3]*

65. Ikkurty and Avadhanam opened an account with Evolve under the "Seneca" name in December 2021 (x1329). Ikkurty was listed as an owner of the Evolve account, using his Portland address.

66. Ikkurty has admitted that the funds that went into the Evolve account were deposits by investors completing their investments into the Rose City Ponzi Scheme, and that amounts paid out of the Evolve account were paid as purported "distributions" that were returns of principal. In just over three months' time almost $6 million was deposited into the Evolve account. $1.6 million of that was transferred to another Evolve account that Ikkurty opened in the Jafia name on a date unknown (x6613).

67. The Evolve account was housed on and operated through Evolve's "Mercury" platform, and monthly statements Mercury issued for the accounts stated that

---

[3] As set forth in Footnote 1, *supra*, the Court has previously approved the settlement of Plaintiffs' claims against Evolve and Mercury. Plaintiffs will be filing a motion for entry of a partial final judgment dismissing all claims as to these defendants in the near future.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 17 of 60

they were issued "on behalf of Evolve Bank & Trust (collectively 'we,' 'us,' 'our' or the 'Bank') by Mercury." At all relevant times hereto, Mercury acted as Evolve's agent with respect to the Seneca account used in furtherance of the Rose City Ponzi Scheme.

68.    Evolve's monthly statements further stated that Evolve delegated some of "our" responsibilities to its agent, Synapse Financial Technologies, Inc. ("Synapse").

69.    Some of Synapse's clients have accused Synapse of having little to no ongoing compliance monitoring, thus increasing risks of fraud.

## DEFENDANTS' ASSISTANCE

70.    Each of the Defendants listed above have robust diligence processes overseen by sophisticated compliance departments. Through these diligence processes they learned facts showing that the Rose City Funds were soliciting the sale of unregistered securities. Throughout the course of their relationships, they had knowledge of a seemingly never-ending stream of illicit transfers of funds between a web of affiliates all controlled by the same individual.

71.    Nonetheless, all of these Defendants provided material aid and participation to the Rose City Ponzi Scheme. Without their assistance, the securities transactions at issue would not have been confected, and the distributions that kept the scheme alive would not have been paid.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 18 of 60

## NON-PARTY INTERACTIONS

### *PNC Bank*

72.    In April 2021, Avadhanam opened a PNC account under the "Seneca" name. This account existed solely to further the Rose City Ponzi Scheme. It was used as a "feeder account" that received small deposits from investors, which the investors often labeled as "investments" and/or for "Rose City," after which the funds were pooled and transferred to another bank utilized in connection with the Rose City Ponzi Scheme to complete individual investors' purported "investment" transactions.

73.    Ikkurty has admitted that the only source of funds into this account was investor funds provided as deposits for investments in the Rose City Funds.

74.    The "business address" Seneca provided was 30 N Gould St STE R Sheridan, WY 82801. This address was also used for the registered agent address, and Registered Agents, LLC was listed as the registered agent. A quick internet search reveals that this Wyoming address has been associated with multiple alleged investment frauds—there are over 53,000 registered businesses at this single address.

75.    PNC closed the account in June 2021.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 19 of 60

*Silvergate*

76.   In May 2021, Ikkurty opened a Silvergate account for Rose City. Throughout the duration of the Rose City Ponzi Scheme funds flowed through the Silvergate account to and from the other Defendant Banks in this case. On the Silvergate account application, Ikkurty listed Rose City's physical street address and business mailing address as 10340 NW Engleman St. Portland, OR 97229—Ikkurty's personal residence. (Consistent therewith, Ikkurty also checked a box stating the business operated out of his home and listed his home address as the operating location later in the application.) Ikkurty further listed the number of physical locations associated with Rose City as "one" on the Silvergate application, *i.e.*, his Portland address.

## PRIMARY VOLATIONS BY THE PERPETRATORS OF THE ROSE CITY SCHEME

77.   The Rose City Funds promised investment profits obtained primarily through trading crypto currency, when in actuality, existing investors were paid through new investors' contributions.

78.   Ikkurty aggressively solicited investments in the Rose City Funds, through, *inter alia*, written pitch decks describing purported investment returns to be paid out of earnings generated through trading cryptocurrency and "proof of stake mining."

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 20 of 60

79.    Ikkurty also hosted online presentations from Portland, and the pitch decks and YouTube videos were created/recorded in and disseminated from Portland by Ikkurty.

80.    Ikkurty continually deployed these solicitations from 2020 until the CFTC froze the Funds' assets in Spring 2022. The YouTube videos were available for the public to view up until at least April 26, 2022.

81.    On January 27, 2021 Ikkurty filed Form D with the United States Securities and Exchange Commission providing Notice of a (purportedly) Exempt Offering in the name of Rose City Income Fund II under a claimed Rule 506(b) exemption. Jafia LLC was listed as a related person, using the PO Box address at the UPS Store in Tampa, Florida, that Ikkurty sometimes used for various entities within the Jafia Group.

82.    The SEC explicitly states that offerings exempt from registration under 506(b) are subject to the requirement of "no general solicitation or advertising to market the securities." The SEC defines general solicitation as "advertisements published in newspapers and magazines, public websites, communications broadcasted over television and radio, and seminars where attendees have been invited by general solicitation or general advertising."

83.    Ikkurty and the Jafia Group blatantly disregarded this directive through their online marketing by creating a publicly accessible website, RoseCityFund.com, which included publicly accessible investment documents, posting publicly

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 21 of 60

accessible YouTube videos, a publicly accessible LinkedIn page, and operating a publicly accessible Instagram with the handle @RoseCityFund.

84. The Jafia Group further disregarded the directive of no general solicitations by soliciting investors at seminars, including but not limited to a November 2021 conference in Washington DC for the Greater Washington Association of Physicians of Indian Origin.

85. Rose City Income Fund II did not qualify for the claimed Rule 506(b) exemption in light of Ikkurty's aggressive solicitation efforts. Ikkurty hired Avadhanam as a "Director of Business Development" responsible for, *inter alia*, "generat[ing] steady leads" to "grow our investor base." Rose City Income Fund II was also sold to unaccredited investors, as acknowledged in a later amended Form D.

86. Rose City Income Fund II was sold by Ikkurty out of Portland, Oregon, and should have been registered with the Oregon Department of Business and Consumer Services.

87. Rose City Income II did not qualify for an exemption from such registration due to its inability to qualify under Rule 506(b).

88. Nonetheless, in or around January 2021, Ikkurty completed a private placement memorandum ("PPM") used to solicit private placement (unregistered) sales in Rose City Income Fund II.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 22 of 60

89.    Consistent with Ikkurty's marketing materials, the PPM stated time and again the Fund would "make periodic payments of net profit to each Limited Partner."

90.    The statements in the PPM concerning the payment of distributions were false, misleading, and untrue. In reality, no "profits" were earned, nor distributed. Distributions were instead paid out of other investors' capital—a critical fact that was not disclosed to investors.

## PLAINTIFFS' INVESTMENTS

### *Amit Fatnani*

91.    Plaintiff Amit Fatnani received Ikkurty's solicitations and offering materials and was convinced to invest in early 2021.

92.    On or around March 1, 2021, Amit invested $100,000 through a Subscription Agreement in Rose City Income Fund II, which has a principal place of business in Portland, Oregon.

93.    The Rose City Income Fund II Subscription Agreement provided that the investment was not complete until the prospective investor completed certain steps, including issuing payment to Rose City by wiring money to Rose City's account at KeyBank and sending executed Subscription Agreements, Limited Partnership Agreements, and a W-9 to Intertrust.

94.    Consistent therewith, Amit wired the funds to Rose City's account with KeyBank, x2139, and sent Intertrust the necessary information.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 23 of 60

95. Intertrust communicated with KeyBank to confirm receipt of those funds and sent Amit confirmation of his subscription in the amount of $100,000, thus completing the sales transaction. Specifically, Amit received a confirmation of investment from Intertrust on March 31, 2021, signed by "Intertrust Corporate and Fund Services LLC" as "Registrar and Transfer Agent of Rose City Income Fund II LP."

96. If Amit had wanted to contribute additional capital to his Rose City investment, he was instructed in the Subscription Agreement to wire funds to Rose City's KeyBank account.

97. The scheduled monthly distributions for Amit's Rose City Income Fund II Investment came from Intertrust, comprised of commingled funds that had flowed through KeyBank, JPMC, and Umpqua at various points in time during the course of Amit's investment.

98. On or around March 17, 2021, Amit purchased a promissory note issued by Rose City Income Fund II's general partner, Jafia LLC, in the amount of $250,000 (hereafter, the "Fatnani Note"). These funds were deposited into Umpqua Bank, where they were used to pay monthly distributions to Amit and others.

99. The terms of the Fatnani Note called for Amit to receive scheduled monthly payments in the form of predated and sequentially numbered paper checks drawn on Jafia's Umpqua account.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 24 of 60

100.    The Umpqua checks were labeled "Interest Payment," and 24 checks were
        signed and given to Amit by Ikkurty to be deposited monthly from April 2021
        through March 2023. These payments were comprised of commingled funds
        that had flowed through KeyBank, JPMC, and Umpqua at various points in
        time during the course of Amit's investment.

101.    For the first year, Amit received scheduled distribution and interest payments
        for both his Rose City Income Fund II investment and the Fatnani Note,
        respectively.

102.    When Amit attempted to cash his monthly Umpqua check in May 2022, his
        personal bank notified him that the check had not cleared. This was the first
        time Plaintiff became aware of issues with his investments with the Rose City
        Funds, Ikkurty, and/or the Jafia Group.

### *Srinivas Guruzu*

103.    In August 2021, while living in Portland, Oregon, Plaintiff Srinivas Guruzu
        learned of the Jafia Group and its investment offerings through his insurance
        agent, whom Ikkurty hired to recruit additional investors.

104.    On or about November 22, 2021, Srinivas invested $50,000 through a
        Subscription Agreement in Seneca Ventures, LLC, which would then invest his
        funds in Rose City Income Fund II.

105.    The Seneca Subscription Agreement provided that the investment was not
        complete until the prospective investor took certain steps, including issuing

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 25 of 60

payment to Seneca by wiring money to the JPMC Seneca Account and sending in an executed Subscription Agreement, Limited Partnership Agreement, and W-9.

106.   Srinivas submitted the required documents to Avadhanam on November 22, 2021.

107.   Srinivas's Subscription Agreement and W-9 included his address at the time, which was 6651 SW Boundary St., Portland, OR 97225.

108.   Srinivas wired the funds from his Wells Fargo account to the JPMC Seneca Account on or about November 24, 2021.

109.   Following his $50,000 wire, Srinivas received correspondence from Avadhanam on November 26, 2021, stating in part, that the Jafia Group was "glad to acknowledge the receipt of funds from your side towards investment into Seneca ventures LLC/ RCIF 2."

110.   In January 2022, Srinivas invested an additional $5,000 in Rose City Income Fund II, again by way of Seneca.

111.   On or about March 31, 2022, Srinivas wired $5,000 from his Wells Fargo account to the Jafia Group's account at Evolve to complete his additional investment.

112.   Srinivas received approximately four distributions before the CFTC froze Jafia's accounts in May 2022.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 26 of 60

<u>The CFTC Freeze</u>

113.  In May 2022, the CFTC obtained an emergency order freezing all of Ikkurty's/the Rose City Funds' assets on the grounds that, *inter alia*, Ikkurty was operating a Ponzi scheme.

114.  The CFTC initially alleged the Ikkurty/the Rose City Funds amassed at least $44 million from hundreds of investors during the perpetration of the Rose City Ponzi Scheme. The final judgment entered in the CFTC action suggests this number is closer to $60 million. Approximately $65 million in claims have been submitted to the Receiver overseeing the unwinding of the Scheme.

115.  Much of the money that was raised was transferred to other participants in the Scheme, while another $18 million was transferred to an offshore entity. To date, none of the money that was raised has generated any investment profit, yet distributions were paid month-in, month-out.

116.  Ikkurty's partner, Ravi Avadhanam, has admitted in the CFTC Action that he and Ikkurty were running a Ponzi scheme.

117.  Ikkurty, too, has admitted that the Rose City Funds operated in Ponzi-like fashion by using investor capital to pay distributions to other investors.

118.  The court ruled in favor of the CFTC and against Ikkurty and Jafia on all counts, calling Rose City "a classic Ponzi scheme."

119.  As discussed below, the Rose City Ponzi Scheme was directly facilitated by Defendants, who offered critical material aid and participation in the sale of

unregistered Rose City securities solicited through misleading statements, and further perpetuated the Ponzi Scheme for well over a year thereafter by allowing Ikkurty free reign to manipulate funds at will.

## DEFENDANT BANKS' REGULATORY AND COMPLIANCE OBLIGATIONS

120.    Defendant Banks – Umpqua, KeyBank, and JMPC, – are obligated to know their customers and monitor their accounts for suspicious activity, and to maintain internal control systems to prevent their services from being misused to carry out illegal activity, particularly financial fraud, and money laundering.

121.    In connection with such obligations, Defendants employ sophisticated electronic monitoring systems to identify banking transactions or patterns that raise "red flags" that are indicative of potentially improper or illegal activity.

122.    Federal regulations, including 12 C.F.R. § 21.21, require Defendant Banks to develop, administer, and maintain programs to ensure compliance with federal Anti-Money-Laundering ("AML") laws. The programs must be approved by the bank's boards of directors and must: (i) provide for a system of internal controls to ensure compliance at all times, including specific "know your customer" requirements to be completed prior to opening an account, (ii) provide for independent testing of the bank's ongoing compliance, (iii) designate an individual to coordinate and monitor compliance, and (iv) provide training for appropriate personnel.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 28 of 60

123. Defendant Banks must also develop customer due diligence programs to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The customer due diligence programs allow banks to maintain awareness of the financial activity of their customers and the ability to predict the type and frequency of transactions in which their customers are likely to engage.

124. Defendant Banks' customer due diligence programs must be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention the Banks pay. Where a customer is determined to be high risk, Banks must gather additional information about the customer and its accounts, including determining: (i) the purpose of the account; (ii) the source of the funds; (iii) the proximity of the customer's residence to the bank; and (iv) explanations for changes in account activity.

125. Defendant Banks must designate compliance officers who are senior bank officials responsible for coordinating and monitoring compliance with federal AML laws. The compliance officers must, in turn, designate individuals at each office or branch to monitor the bank's day-to-day compliance.

126. Defendant Banks also receive guidance from the Federal Financial Institutions Examination Council ("FFIEC"), which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 29 of 60

describe certain "red flags" that indicate possible money laundering schemes and other misconduct. Examples of these suspicious indicia relevant to the allegations in the instant case include, but are not limited to:

    i.     "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

    ii.     "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

    iii.     "Unusual use of trust funds in business transactions or other financial activity."

    iv.     A large volume of . . . funds transfers is deposited into . . . an account when the nature of the accountholder's business would not appear to justify such activity."

    v.     "A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

    vi.     "Goods or services purchased by the business do not match the customer's stated line of business . . . [or the] profile of the company provided by respondent bank or character of the financial activity; a company references remarkably dissimilar goods and services in related funds transfers;

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 30 of 60

explanation given by foreign respondent bank is inconsistent with observed funds transfer activity."

vii.  "The stated occupation of the customer is not commensurate with the type or level of activity."

viii.  "Customer makes high value transactions not commensurate with the customer's known incomes."

ix.  "Payments or receipts with no apparent links to legitimate contracts, goods or services are received."

x.  "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

xi.  Funds transfers contain limited content and lack related party information."

xii.  "A bank is unable to obtain sufficient information or information is unavailable to positively identify originators or beneficiaries of accounts or other banking activity (using internet, commercial database searches, or direct inquiries to a respondent bank)."

xiii.  "Funds transfers are sent or received from the same person to or from different accounts."

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 31 of 60

    **xiv.** "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

    **xv.** "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

    **xvi.** "Purpose of shell company is unknown or unclear."

    **xvii.** "Funds are sent or received via international transfers from or to higher-risk locations."

127. Consistent with FFIEC guidance, Defendant Banks maintain systems of controls sufficient to identify broad patterns, sometimes across multiple accounts. The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities are all subject to examination.

128. Defendant Banks contextualize their scrutiny, analyzing suspicious activity against the backdrop of industry norms, as well as the customers' own backgrounds. Defendant Banks are expected to use sources of information like the internet, commercial database searches, and direct inquiries to a respondent bank, to ascertain the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

129. Defendant Banks collect and maintain information about their customers and their banking behaviors in order to, among other things, detect and prevent

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 32 of 60

money laundering and fraud and to protect themselves from third party liability and reputational harm.

130. As required by Federal law, Defendant Banks maintain procedures to know the identity of each customer, collect information about the holder of each account, and understand a customer's banking behavior. *See* 31 C.F.R. §§ 1020.220(a)(1), (2). When an entity rather than an individual opens an account, the banks obtain information about the individual with control of the account. *Id*.

131. The information that Defendant Banks collect about new business account clients includes the purpose and nature of the business, anticipated activity in the account, where the customer expects to transact business, and the products and services commonly used by the customer.

132. Using the information collected, as well as external resources like internet search engines and public and commercial record databases, Defendant Banks create an initial client profile and assign a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When a Defendant Bank becomes aware that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions

appear inconsistent with the bank's understanding of the nature and purpose of the account.

133. Defendant Banks also maintain internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

134. Through these programs, Defendant Banks obtain information that gives them an understanding of the unique financial activity of their customers. Likewise, Defendant Banks can predict the type and frequency of transactions in which their customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

135. Defendant Banks also make employee compliance with applicable banking regulations and knowledge of AML guidelines a condition of employment and incorporates them into job descriptions and performance evaluations. The banks give AML training to all operational personnel whose duties may require such knowledge, including tellers and wire room personnel, to enable them to recognize indicia of money laundering and fraud in the course of their work. In addition, supervisory personnel, specifically designated by Defendant Banks'

chief compliance officers, oversee the day-to-day implementation of the banks' risk management framework at the individual branches.

136. Complementing the human effort are Defendant Banks' advanced transaction monitoring software portfolios, which include artificial intelligence and data analytics software platforms. These software platforms can reveal hidden connections and relationships between transacting parties across accounts and transactions.

137. Defendant Banks' advanced transaction monitoring software portfolios automatically review transactions against customers' backgrounds and transaction histories, compare account activity against AML and other compliance red flags, and automatically detect and analyze abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

## DEFENDANTS' FAILURES TO COMPLY
## WITH THEIR OBLIGATIONS IN THIS CASE

138. The magnitude, complexity, and speed of the Jafia Group's account activity strongly suggests that Defendant Banks assigned account managers, relationship managers, or their equivalent to the Jafia Group's accounts.

139. When Ikkurty and/or Avadhanam went to establish relationships with the Defendant Banks, each entity had a compliance checklist or similar document

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 35 of 60

setting forth specific inquiries to be made and policies and procedures to be followed to determine the legitimacy of the entity opening the account.

140. In connection with this analysis Defendants searched publicly-available records detailing, *inter alia*, the Jafia Group's business and history. They also obtained documents directly from Ikkurty.

141. During the course of these searches the Defendants identified both the Form D filed by Ikkurty claiming the Regulation D exemption, as well as his online solicitations for the same securities he claimed were exempt. Indeed, Ikkurty made no secret of the fact that he solicited investments in the Rose City Funds—his partner, Avadhanam, was hired for this specific purpose.

142. Nonetheless, Defendants went forward with the relationships with the Jafia Group. In the case of the Defendant Banks, they received funds clearly earmarked for "investments" in one of the Rose City Funds (which funds were promptly transferred to other accounts in the names of the Jafia Group members). The receipt of these funds was the final step in consummating victims' "investment" in the Rose City Ponzi Scheme, as required by the Funds' offering documents. Without Defendant Banks' willingness to accept and credit funds, there would be no investments.

143. After the investments were completed the Defendant Banks permitted and facilitated the Jafia Group's (previously defined as Ikkurty, Jafia, Seneca, and the Rose City Funds) and their agents' use of Defendant Banks' accounts to

carry out unlawful activity, despite knowing that the Jafia Group and its agents were abusing the banks' services by, *inter alia*:

    i.    Taking in large sums obviously constituting deposits from investors, and indeed, generally designated on their face as for investment purposes;

    ii.    Transferring on a monthly basis hundreds of thousands of dollars or more from those same accounts back to investors in routine sequence, which transfers were obviously structured as purported interest or distribution payments;

    iii.    Disbursing funds for non-legal purposes such as the commingling and misappropriation of investor funds into the coffers of Jafia Group's principals and affiliates. Indeed, once funds entered the Jafia Group's web of accounts, they were all "pooled together" and treated as one lump sum, regardless of source.

144. There were other indicia of fraud as well. For example, monthly statements issued by Defendant Banks show that many of the Jafia Group's transactions were in large, round number, and often-repeated dollar amounts, a transfer pattern indicative of money-laundering activities.

145. Moreover, all of this was done without indicators of normally-expected activity in the bank accounts of a legitimately and lawfully functioning crypto currency

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 37 of 60

investment company – for example, the CFTC has determined that Ikkurty never actually invested in any cryptocurrency at all.

146. The account activity and account statements visible to Defendant Banks reflected these improper transactions using investor funds by the Jafia Group and its agents. Multiple banks closed Jafia Group accounts in light of suspicious activities. In that instance Ikkurty would simply move on to another bank. The terminating Bank had the ability to notify the new Bank of Ikkurty's suspicious activities but chose not to do so.

147. Despite being privy to these and other signs of wrongdoing set forth in more detail in the complaint, Defendants did not terminate their relationship with the Jafia Group or take steps to stop the Rose City Ponzi Scheme. Instead, Defendants continued to serve the Jafia Group and facilitate illegal investments in unregistered securities, thus allowing the Jafia Group to continue to operate the Rose City Ponzi Scheme for well over a year.

148. Defendants knew the Jafia Group was using accounts and/or relationships with their institutions for improper purposes but nonetheless allowed the Jafia Group to pay purported "interest" or "distributions" comprised of new investor money, and to allow the Jafia Group principals and affiliates to enrich themselves through direct payments from Defendant Bank accounts.

149. Federal regulations, including 12 C.F.R. § 21.21, require banks to develop, administer, and maintain a program to ensure compliance with federal Anti-

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 38 of 60

Money-Laundering laws. AML programs must (a) provide a system of internal controls to ensure compliance at all times, (b) provide for independent testing of the bank's ongoing compliance, (c) designate an individual to coordinate and monitor compliance, and (d) provide training for appropriate personnel.

150. Each Defendant, due to mandatory obligations to comply with governmental banking laws and regulations, as well as based on their own risk management and compliance protocols and dealings with the Rose City Funds, either (a) must have known that the Jafia Group / Rose City Fund securities were being sold to investors in violation of Oregon securities laws, or (b) in the alternative, disregarded due to recklessness or gross negligence that the Jafia Group / Rose City Fund securities were being sold to investors in violation of Oregon securities laws.

151. Each Defendant had internal controls in place that were capable of detecting – and must have detected – the Rose City Ponzi Scheme, including a customer identification program; customer due diligence processes; account opening and monitoring procedures; ongoing training for employees; and automated account monitoring systems.

152.  Pursuant to mandated compliance procedures requiring each Defendant to "know its customer," each Defendant possessed information before or at the time each of their relationships were established with the Jafia Group/Rose City Funds were opened sufficient to show that the Jafia Group and/or its

agents, including, without limitation, Ikkurty and Avadhanam, were engaged in securities investment transactions.

153.  Moreover, once these relationships were established, each Defendant, due to ongoing account monitoring policies and procedures, must have detected, or disregarded with recklessness or gross negligence, transactions that showed (a) recently deposited investor money in the Rose City Funds' accounts being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam being used for reasons other than in furtherance of supposed Rose City Fund investment purposes.

154.  Due to governmentally mandated initial and ongoing due diligence and compliance obligations for banks and other entities engaged in securities transactions, each Defendant further had detected, or disregarded with recklessness or gross negligence, that (a) the Jafia Group/Rose City Fund was selling unregistered securities to investors, (b) agents of the Jafia Group entities, including Ikkurty and Avadhanam, were improperly soliciting and sell securities, and/or (c) the Jafia Group and its agents were selling securities to investors by making untrue statements of material facts and by omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155.    In tandem with federal regulations, the Defendant Banks receive guidance from the FFIEC, which outlines "red flags" that indicate possible money laundering schemes and other misconduct mandating further inquiry, many of which were present, such as (a) Ikkurty and Avadhanam kept close control over the bank accounts and management of the Jafia Group and the Rose City Funds, (b) the Jafia Group did not use outside accounting firms to manage or audit its finances and never provided Defendants with independent audit reports, (c) the Jafia Group exploited their shared affinity with the Indian-American community, (d) the Jafia Group transferred funds to offshore accounts or entities, and (e) the Jafia Group made many "large, round dollar" and other transactions consistent with fraudulent conduct.

156.    Each Bank Defendant participated and materially aided Ikkurty and Avadhanam in selling the Jafia Group / Rose City Fund securities to Plaintiffs and the Class and further facilitating continued distributions to unwitting investors, thereby perpetuating the Rose City Ponzi Scheme.

157.    Each Bank Defendant provided bank accounts to Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam with the understanding those bank accounts were related to the investments in the Jafia Group / Rose City Fund.

158.    In the course of opening and maintaining the Jafia Group Bank Accounts, each Defendant participated and materially aided in completing securities

transactions and using recently deposited investor money in the subject accounts to fund outgoing payments to existing investors.

159. Umpqua's participation and aid were critical to the success of the sale of the Jafia Group / Rose City Fund securities. Umpqua received and deposited approximately $24 million in funds invested in the Jafia Group Securities between July 2021 and March 2022, thus "completing" these transactions. Umpqua further participated and materially aided in multiple transfers to and from its accounts that facilitated: (a) recently deposited investor money being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds transferred to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam for reasons other than in furtherance of Jafia Group/ Rose City Fund investment purposes.

160. KeyBank's participation and aid were critical to the success of the sale of the Jafia Group / Rose City Fund securities. KeyBank received and deposited initial investment funds beginning in early 2021. KeyBank participated and materially aided in multiple transfers to and from its accounts that facilitated: (a) recently deposited investor money being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds transferred to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam for reasons other than in furtherance of Jafia Group / Rose City Fund investment purposes.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 42 of 60

161.  JPMC's participation and aid were critical to the success of the sale of the Jafia Group / Rose City Fund securities. JPMC received and deposited approximately $13 million in funds invested between June 2021 and January 2022. JPMC participated and materially aided in multiple transfers to and from these accounts that facilitated: (a) recently deposited investor money being used to fund outgoing payments to existing investors, and/or (b) recently deposited investor funds transferred to other accounts controlled by Ikkurty, Avadhanam, or entities affiliated with Ikkurty and/or Avadhanam for reasons other than in furtherance of Jafia Group / Rose City Fund investment purposes.

## CLASS ACTION ALLEGATIONS

162.  Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully stated.

163.   Plaintiffs bring this action individually and on behalf of all other persons similarly situated (referred to as "the Class") under Federal Rule of Civil Procedure 23.

164.   Plaintiffs propose the following Class definition(s), subject to amendment as appropriate:

  i.  All persons who invested with Ikkurty, Avadhanam, or Jafia, LLC, either through:

    a.  Rose City Income Fund,

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 43 of 60

      **b.** Rose City Income Fund II, LP,

      **c.** Jafia, LLC,

      **d.** MySivana, LLC

      **e.** Merosa, LLC or

      **f.** Seneca Ventures, LLC.

      **g.** Or any other Jafia Group affiliated entity that banked with or utilized the services of Defendants, and,

    **ii.** Whose funds were held in or transferred through accounts opened with and/or maintained/administered by Defendants, and/or who received distributions or other payments of funds from or transferred through accounts opened with and/or maintained/administered by Defendants between August 24, 2020 and May 19, 2022.

165. Plaintiffs reserve the right to amend this Complaint to assert claims on behalf of additional classes or subclasses of investors in any of the other funds described in the complaint.

166. Collectively, all these persons identified in the Class definition(s) above will be referred to as "Class members." Plaintiffs represent, and are members of, the Class.

167. Excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, and Defendants' agents and employees, and any

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 44 of 60

Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

168.    Plaintiffs do not know the exact number of members in the Class, but reasonably believes Class members number, at a minimum, to be 300. Further, the Class can be identified easily through records maintained by Defendants.

169.    The joinder of all Class members is impracticable due to the number of Class members. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits and inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class(es).

170.    The claims of Plaintiffs are typical of the claims of the Class(es) they seek to represent. Plaintiffs and other Class members invested in one of the entities or funds controlled by the Jafia Group during the relevant time period. All of their investments were deposited in Defendants' accounts and the payments owed to them were made using Defendants' accounts, and as such, the claim of one investor is the same for all investors.

171.    There are well-defined, nearly identical, common questions of law and fact affecting all parties that predominate over questions that may affect individual Class members, including but not limited to the following:

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 45 of 60

    **i.**     Whether Defendants participated in or materially aided the Jafia Group in their perpetration of a Ponzi or Ponzi-like Scheme;

    **ii.**    Whether Defendants knowingly participated in or materially aided the Jafia Group in their perpetration of a Ponzi-like Scheme;

    **iii.**   Whether Defendants acted negligently in servicing and/or allowing the Jafia Group's account(s) held at and/or administered by JPMC, KeyBank, and/or Umpqua to be used to further a Ponzi or Ponzi-like Scheme;

    **iv.**   Whether Defendants participated in the sale of unregistered securities;

    **v.**    Whether Defendants were willfully or grossly negligent in servicing and/or allowing the Jafia Group's account(s) to be used to further a Ponzi or Ponzi-like Scheme.

172. These and other common issues predominate over any individual issues. The focus of these claims is on the conduct of Defendants, which did not vary between Class members. Resolution of these common questions will drive the claims of all Class members toward judgment or resolution; they involve a "fatal similarity" for purposes of the claims of all Class members.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 46 of 60

173. For all these reasons, a Class Action is the superior method for the fair and efficient adjudication of this controversy.

174. Plaintiffs and members of the Class(es) have been harmed and/or continue to be harmed by the foregoing and other acts of Defendants. Plaintiffs seek damages on behalf of themselves and all Class members, including but not limited to return of their investments, with the interest the Jafia Group represented would be paid, as well as consequential damages in an amount to be proven at trial.

175. Plaintiffs will fairly and adequately represent and protect the interests of the Class and have no interests which are antagonistic to any member of the Class.

176. Plaintiffs have retained counsel experienced in handling class action claims involving fraud and securities violations. Plaintiff's counsel is also experienced in prosecuting the claims of investors against entities that have engaged in malfeasance with respect to investments.

177. Class-wide relief is essential to resolve the claims regarding all potential investors relating to Defendants in an equitable, even-handed fashion.

178. Plaintiffs therefore seek certification of the Class(es) under Rules 23(b)(1)(A) and (b)(3).

179. Plaintiffs seek certification of a Rule 23(b)(1)(A) Class. Adjudicating Defendants' liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual Class members

that would establish incompatible standards of conduct for the Defendants if a Class is not certified.

180.  Plaintiffs seek certification of a Rule 23(b)(3) Class. As detailed above, common questions regarding Defendants' conduct predominate over any individual issues, and a Class Action is superior to the alternative of over a hundred individual cases involving the same core facts and claims addressed to Defendants' conduct.

181.  In the alternative, Plaintiffs seek certification of an "issues" Class under Rule 23(c)(4). This Class would incorporate, and allow for the adjudication of, all issues the Court adjudges to be common to members of the Class and Subclass, such as one or more of the common issues identified by Plaintiffs in the above paragraphs.

## CAUSES OF ACTION

### First Cause of Action:

### Violations of ORS 59.115(3) for Participating In and/or Materially Aiding the Sale of Unregistered Securities in Violation of ORS 59.055 and 59.115(1)(a)

182.  Plaintiffs incorporate by reference and reallege all other paragraphs of this Complaint as if fully stated herein.

183.  Ikkurty, Avadhanam, and the Jafia Group sold limited partnership interests in Rose City Income Fund and Rose City Income Fund II ("Rose City LP Interests").

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 48 of 60

184. Ikkurty and Avadhanam, individually and on behalf of the Jafia Group sold debt instruments issued by Jafia LLC, the Rose City Income Fund and/or the Rose City Income Fund II ("Rose City Notes").

185. Ikkurty and Avadhanam, individually and on behalf the Jafia Group and/or the Rose City Funds, solicited and sold the Rose City LP Interests and the Rose City Notes from their principal place of business in Portland, Oregon.

186. The Rose City LP Interests and the Rose City Notes were required to be registered with Oregon's Department of Business and Consumer Services unless an applicable exemption from registration applies.

187. The Rose City LP Interests and the Rose City Notes did not qualify for an applicable exemption from registration. They are not federal covered securities. While Ikkurty, the Jafia Group and/or Rose City Income Fund II filed a Form D with the SEC claiming a Rule 506(b) exemption, that exemption is not available to the Rose City LP Interests and/or the Rose City Notes in light of (1) Ikkurty's, Jafia Group's, and/or Rose City Funds' solicitation of investors, and/or (2) the fact that the Rose City LP Interests and Rose City Notes were sold to unaccredited investors in excess of those permitted under Rule 506(b) and without the accompanying required disclosure documents.

188. The sale of the Rose City Interests and/or the Rose City Notes thus violated ORS 59.055.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 49 of 60

189.   The sale of the Rose City Interests and/or the Rose City Notes thus also violated ORS 59.115(1)(a).

190.   Defendants participated in and provided material aid to the unregistered sale of the Rose City Interests and the Rose City Notes. The offering documents used to sell these securities made clear that the sale was not complete, and the interest not transferred, until the funds were received and accepted for deposit by one of the Defendants. The Defendants received these funds, marked as "Investments" in "Rose City," and credited them for deposit, in spite of their knowledge of facts making clear that the Interests and Notes were sold as unregistered securities in violation of Oregon law.

191.   Defendants are jointly and severally liable for the sale of unregistered securities under ORS 59.115(3) because they participated in and materially aided unlawful sales of unregistered securities as set forth above.

192.   Under ORS 59.115(2)(a), upon tender of the securities, Defendants are jointly and severally liable for the consideration paid for the securities, plus interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%, less any amounts Plaintiffs received on the securities.

193.   Under ORS 59.115(10), Defendant Banks should be required to pay the reasonable attorney fees of Plaintiffs.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 50 of 60

## Second Cause of Action:

### Violations of ORS 59.115 (3) for Participating In and/or Materially Aiding Violations of ORS 59.115(1)(b) and 59.135(1)-(3)

194. Plaintiffs incorporate by reference and realleges all other paragraphs of this Complaint as if fully stated herein.

195. Ikkurty, Avadhanam, and the Jafia Group solicited sales of the Rose City LP Interests and the Rose City Notes by making verbal and written statements that distributions and/or payments on these securities would be funded by earnings generated through cryptocurrency trading and "proof of stake mining."

196. Ikkurty, Avadhanam, and the Jafia Group further disseminated written offering documents confirming that distributions paid to investors would be paid out of profits/earnings.

197. These statements were false when made. At all times material hereto the Rose City Funds were operated as a Ponzi scheme that utilized new investor capital to pay distributions to prior investors.

198. One of the perpetrators of the Rose City Ponzi Scheme, Avadhanam, has admitted that it was a Ponzi Scheme. Ikkurty has likewise admitted that investor principal was used to pay distributions. The CFTC court ruled in favor of the CFTC and against Ikkurty and Jafia on all counts, calling Rose City "a classic Ponzi scheme."

199. Ikkurty, Avadhanam, and the Jafia Group knew their statements regarding distributions in connection with their solicitation of sales of the Rose City Interests and Notes were false and/or made misleading in that they omitted that the promised distributions would be funded by investor deposits.

200. All sales of Rose City Interests and Rose City Notes were made in violation of ORS 59.135(1)-(3).

201. All sales of Rose City Interests and/or the Rose City Notes were also made in violation of ORS 59.115(1)(b).

202. Defendants participated in and provided material aid to the unlawful sale of Rose City Interests and the Rose City Notes. The offering documents used to sell these securities made clear that the sale was not complete, and the interest not transferred, until the funds were received and accepted for deposit by one of the Defendant Banks. For more than a year Defendants received these funds, marked as "Investments" in "Rose City," and credited them for deposit, in spite of their knowledge of facts making clear that distributions on the Interests and Notes were being paid with investor deposits, in violation of Oregon Securities Law.

203. Defendants also participated in and provided material aid to the unlawful sale of the Rose City Interests and Notes by, *inter alia*, processing monthly distributions to existing investors using newly invested capital, thus perpetuating the scheme and allowing it to continue unabated for over a year.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 52 of 60

204. Defendants are jointly and severally liable for the violations of ORS 59.115(1)(b) and/or 59.135(1)-(3) alleged herein under ORS 59.115(3) because the Defendants participated in and materially aided unlawful sales of unregistered securities as set forth above.

205. Under ORS 59.115(2)(a), upon tender of the securities, Defendants are jointly and severally liable for the consideration paid for the securities, plus interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%, less any amounts Plaintiffs received on the securities.

206. Under ORS 59.115(10), Defendants should be required to pay the reasonable attorney fees of Plaintiffs.

### Third Cause of Action:

### Violations of ORS 59.137 (1) for Materially Aiding Violations of ORS 59.135 (1), (2), and (3)

207. Plaintiffs incorporate by reference and realleges all other paragraphs of this Complaint as if fully stated herein.

208. Ikkurty, Avadhanam, and the Jafia Group solicited sales of the Rose City LP Interests and the Rose City Notes by making verbal and written statements that distributions and/or payments on these securities would be funded by earnings generated through cryptocurrency trading and "proof of stake mining."

209. Ikkurty, Avadhanam, and the Jafia Group further disseminated written offering documents confirming that distributions paid to investors would be

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 53 of 60

paid out of profits/earnings.

210. These statements were false when made. At all times material hereto the Rose City Funds were operated as a Ponzi scheme that utilized new investor capital to pay distributions to prior investors.

211. One of the perpetrators of the Rose City Ponzi Scheme, Avadhanam, has admitted that it was a Ponzi Scheme. Ikkurty has likewise admitted that investor principal was used to pay distributions. The CFTC court ruled in favor of the CFTC and against Ikkurty and Jafia on all counts, calling Rose City "a classic Ponzi scheme."

212. Ikkurty, Avadhanam, and the Jafia Group knew their statements regarding distributions in connection with their solicitation of sales of the Rose City Interests and Notes were false and/or made misleading in that they omitted that the promised distributions would be funded by investor deposits.

213. All sales of Rose City Interests and Rose City Notes were made in violation of ORS 59.135(1)-(3).

214. The Defendants provided material aid to the unlawful sale of Rose City Interests and the Rose City Notes. The offering documents used to sell these securities made clear that the sale was not complete, and the interest not transferred, until the funds were received and accepted for deposit by one of the Defendants. For more than a year the Defendants received these funds, marked as "Investments" in "Rose City," and credited them for deposit, in spite

of their knowledge of facts making clear that distributions on the Interests and Notes were being paid with investor deposits, in violation of Oregon Securities Law.

215.    Defendants also participated in and provided material aid to the unlawful sale of the Rose City Interests and Notes by, *inter alia*, processing monthly distributions to existing investors using newly invested capital, thus perpetuating the scheme and allowing it to continue unabated for over a year.

216.    Defendants are liable for the violations of ORS 59.135(1)-(3) alleged herein under ORS 59.137(1) because the Defendants materially aided the violations of ORS 59.135(1)-(3) as set forth above.

217.    Under ORS 59.137(1), Defendants are liable for all actual damages caused by the violation.

218.    Under ORS 59.137(4), Defendants should be required to pay the reasonable attorney fees of Plaintiffs.

## Fourth Cause of Action:

## Joint Liability for Tortious Conduct of Ikkurty, Avadhanam, and the Jafia Group under Restatement (2d) 876 (b)

219.    Plaintiffs incorporate by reference and realleges all other paragraphs of this Complaint as if fully stated.

220.    Ikkurty, Avadhanam, and the Jafia Group solicited sales of the Rose City LP Interests and the Rose City Notes by making verbal and written statements that distributions and/or payments on these securities would be funded by

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 55 of 60

earnings generated through cryptocurrency trading and "proof of stake mining."

221. Ikkurty, Avadhanam, and the Jafia Group further disseminated written offering documents confirming that distributions paid to investors would be paid out of profits/earnings.

222. These statements were false when made. At all times material hereto the Rose City Funds, including the Rose City Interests and Rose City Notes, were operated as a Ponzi scheme that utilized new investor capital to pay distributions to prior investors.

223. One of the perpetrators of the Rose City Ponzi Scheme, Avadhanam, has admitted that it was a Ponzi Scheme. Ikkurty has likewise admitted that investor principal was used to pay distributions. Further, the court ruled in favor of the CFTC and against Ikkurty and Jafia on all counts, calling Rose City "a classic Ponzi scheme."

224. Ikkurty, Avadhanam, and the Jafia Group knew their statements regarding distributions in connection with their solicitation of sales of the Rose City Interests and Notes were false and/or made misleading in that they omitted that the promised distributions would be funded by investor deposits.

225. Ikkurty, Avadhanam, and the Jafia Group, as General Partners and/or agents thereof, had a fiduciary duty to provide honest and accurate information to their Limited Partners concerning their investments.

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 56 of 60

226. Ikkurty, Avadhanam, and the Jafia Group, as General Partners and/or agents thereof, also had a fiduciary duty to safeguard Limited Partners' funds by, *inter alia*, investing them for their stated purpose, not utilizing those funds for personal gain, not distributing them to other investors, and not operating a Ponzi scheme.

227. Ikkurty, Avadhanam, and the Jafia Group breached the fiduciary duties owed to their partners.

228. The Defendants knew that Ikkurty, Avadhanam, and the Jafia Group were breaching their fiduciary duties through the conduct described above. The Defendants had actual knowledge of, *inter alia*, the fact that investor capital was being returned as "distributions."

229. Nonetheless, Defendants provided substantial assistance and encouragement to these breaches of fiduciary duty described above.

230. The Defendants provided substantial assistance and encouragement to these breaches by receiving funds, marked as "Investments" in "Rose City," and crediting them for deposit, and further, by continuing to process distributions of investor capital in order to perpetuate the scheme.

231. Defendants further provided substantial assistance and encouragement to these breaches by, *inter alia*, processing monthly distributions to existing investors using newly invested capital, thus perpetuating the scheme and allowing it to continue unabated for over a year, all at the expense of existing

limited partners. Defendants are jointly and severally liable for all damages caused by Ikkurty's, Avadhanam's, and the Jafia Group's breaches of fiduciary duty.

## DEMAND FOR JURY TRIAL

232. Plaintiffs demand a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant Plaintiffs and all Class members the following relief against Defendants: **(i)** For all recoverable compensatory and other damages sustained by Plaintiffs and the Class; **(ii)** For the rescission of all investments made by Plaintiffs and the Class through Defendants; **(iii)** An award of attorneys' fees and costs to counsel for Plaintiffs and the Class to the extent permitted by applicable law; **(iv)** An order certifying this action to be a proper class action under Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representative of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class; and **(v)** Such other relief as the Court deems just and proper.

RESPECTFULLY FILED,

*Daniel B. Centner*
**Daniel B. Centner** (admitted *pro hac vice*)
Peiffer Wolf Carr Kane Conway
& Wise, LLP
935 Gravier St., Suite 1600

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 58 of 60

New Orleans, LA 70112
dcentner@peifferwolf.com
gvanhancock@peifferwolf.com
Phone 504-523-2434
Fax 504-608-1465


Additional Counsel:

**Michael Fuller, OSB No. 09357**
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
michael@underdoglawyer.com
Phone 503-222-2000

**Kelly D. Jones, OSB No. 074217**
Law Office of Kelly D. Jones
819 SE Morrison Street Suite 255
Portland, Oregon 97214
kellydonovanjones@gmail.com        Phone
503-847-4329

**Daniel J Nichols, OSB No. 101304**
JurisLaw LLP
Three Centerpointe Drive, Suite 160 Lake
Oswego, Oregon 97035 dan@jurislawyer.com
Phone 503-334-0611

**Emily Templeton, OSB No. 221744**
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
emily@underdoglawyer.com
Phone 971-352-2503

**Nate Haberman, OSB No. 225456**
OlsenDaines
US Bancorp Tower
111 SW 5th Ave., Suite 3150


**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 59 of 60

Portland, Oregon 97204
nate@underdoglawyer.com
Phone 503-222-2000

**Scott Silver** (admitted *pro hac vice*)
Silver Law Group
11780 W Sample Rd
Coral Springs, Florida 33065
ssilver@silverlaw.com
Phone 954-755-4799

**Ryan Schwamm** (admitted *pro hac vice*)
Silver Law Group
11780 W Sample Rd
Coral Springs, Florida 33065
rschwamm@silverlaw.com
Phone 954-755-4799

**Peter M. Spett** (admitted *pro hac vice)*
Law Office of Peter M. Spett
3020 Windsor Circle
Boca Raton, Florida 33434
pspett@spettlaw.com
Phone 561-463-2799

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served on all counsel of record via operation of the Court's CM/ECF system on this 30th day of May, 2025

*/s/ Daniel B. Centner*
Daniel B. Centner

**FOURTH AMENDED CLASS ACTION COMPLAINT** – Page 60 of 60